## THE PEOPLE *v.* SUTTON.

### APPEAL from the District Court of San Juan, Section 2.

#### No. 243.—Decided March 31, 1911.

PENAL LAW—VOLUNTARY HOMICIDE—CHARACTER OF DECEASED.—It is incumbent upon the defendant who wishes to introduce evidence of the character and penal antecedents of the deceased to show that he knew of his bad character. Should he not offer to introduce such evidence, the court commits no error in refusing to admit testimony as to the character of the dead man.

ID.—EXCLUSIÓN OF EVIDENCE—GROUNDS OF DECISION.—Even where the grounds of a decision excluding testimony be erroneous, the giving of false ground for such ruling is no reason for reversing the judgment appealed from if said testimony has been properly excluded.

ID.—SELF-DEFENSE—RESULT OF FAILURE TO CONSIDER THIS PLEA.—An objection made by the appellant to the judgment appealed from on the ground that the court did not give proper consideration to the defendant's plea of self-defense is tantamount, in its legal effects, to an exception to the judgment, for the reason that the finding was not warranted by the evidence.

ID.—CASES TRIED BY THE JURY—REVIEW OF QUESTIONS ARISING DURING THE TRIAL.—When the court sits with a jury a review of questions arising during the trial is obtained by means of the preservation of exceptions, either to the admission or exclusion of evidence, or to the granting or refusal of instructions to the jury.

CASES TRIED BY THE COURTS OF LAW—WAIVER OF TRIAL BY JURY.—In cases where the court is substituted for the jury because the defendant has waived a jury trial and the finding of the court is general, such finding must be given the same effect as the verdict of a jury.

ID.—PROSECUTIONS FOR FELONY—MISDEMEANORS—WAIVER OF TRIAL BY JURY.—According to the Constitution of the United States a defendant prosecuted for felony may not waive his right of a jury trial, though he may do so in cases of misdemeanor.

ID.—TRIAL BY JURY IN PORTO RICO—WAIVER—CONSTITUTION OF THE UNITED STATES.—The provisions of section 278 of the Code of Criminal Procedure of Porto Rico which allow the defendant the right to elect, in a noncapital case, to be tried by a jury, and if he does not so elect in due time the right of jury trial is deemed to have been waived, do not violate the Constitution of the United States.

ID.—FINDING ON THE EVIDENCE—REVIEW CN APPEAL.—It is the invariable doctrine of the courts of the United States that the finding on the evidence by a trial court will not be reviewed on appeal to resolve a conflict in the evidence, unless it be shown that the court below was actuated by passion, prejudice, or some like element.

ID.—JUDGMENT CONTRARY TO THE EVIDENCE—CONTRADICTORY EVIDENCE—WEIGHING OF THE EVIDENCE BY THE TRIAL COURT.—A judgment rendered in a criminal prosecution tried by a court of law, the defendant having waived his right to be tried by a jury, cannot be reversed on the ground that it is contrary to the evidence and that the latter was insufficient, when upon examination of the evidence it appears to have been contradictory, for in such cases the finding of the trial court is final and cannot be reviewed unless it be shown that the court was moved by passion, prejudice, or partiality.

ID.—REVIEW OF THE EVIDENCE—APPEAL FROM THE JUDGMENT—APPEAL FROM AN ORDER REFUSING TO GRANT A NEW TRIAL.—The principles governing the review of the evidence on appeal from the judgment are the same as those applied to the review of the evidence on appeal from an order refusing to grant a new trial, said principles being equally applicable to both civil and criminal cases.

ID.—PLEA OF SELF-DEFENSE—JUSTIFIABLE HOMICIDE.—To establish a case of justifiable homicide it must appear that something more than an ordinary assault was made upon the prisoner; it must also appear that the assault was such as would lead a reasonable person to believe that his life was in peril or that he was in danger of receiving great bodily injury.

ID.—PLEA OF SELF-DEFENSE—APPARENT DANGER.—Self-defense cannot be successfully pleaded based upon apparent danger; there must be some overt act on the part of the assailant which from its character would give a reasonable man, situated as was the defendant, the ground to believe that there was danger to his life or of deadly violence to his person, without which requisites the plea of self-defense cannot stand.

ID.—PLEA OF SELF-DEFENSE—DISPARITY OF PHYSICAL POWER BETWEEN ASSAILANT AND ASSAILED.—Disparity of physical power and strength between two men does not justify the weaker party in resorting to a deadly weapon when threatened with an assault by or with fists alone, unless the circumstances under which they are placed are sufficient to induce him to believe that great bodily injury to himself might result from the assault.

ID.—CONSIDERATION OF EVIDENCE—EXPERT TESTIMONY.—The court, in weighing
the expert evidence, is not bound to accept the conclusions of an expert
tending to show that the wounds were produced in some other way than by
the barbed wire fence.

ID.—OPINION OF THE TRIAL COURT—TRANSCRIPT OF RECORD.—The opinion of the
trial court in support of its conclusion forms no part of the transcript of the
record filed on appeal, nor can said opinion be examined in order to determine
the findings of fact upon which the trial judge based his judgment.

ID.—REVIEW OF FACTS PROVEN—BILL OF EXCEPTIONS—STATEMENT OF FACTS.—
The facts proven in the court below can be reviewed only when set forth in a
bill of exceptions or statement of facts, and the Supreme Court cannot review
facts stated in the opinion of the court as grounds for its judgment.

ID.—NEW TRIAL—JUDGMENT CONTRARY TO THE EVIDENCE.—A judgment appealed
from having been affirmed, because not found contrary to the evidence, as
alleged by the appellant, an order refusing a new trial made in the same case
and for the same reasons must also be affirmed.

The facts are stated in the opinion.

Messrs. *Manuel F. Rossy* and *Willis Sweet* for appellant.

Mr. *Jesús M. Rossy, fiscal,* for respondent.

MR. JUSTICE WOLF delivered the opinion of the court.

The appeal in this case was taken from a sentence of
the Second Section of the District Court of San Juan. The
appellant was there charged with voluntary manslaughter,
and elected to be tried by the court without a jury. The
court found him guilty of the crime charged and sentenced
him to five years in the penitentiary at hard labor. The
appellant asks the reversal of the judgment substantially on
two grounds. An error of law is alleged to have been com-
mitted in excluding from the evidence a certificate from the
superintendent of prisons ostensibly to prove the character
of the dead man, José Rosa, and his penal antecedents. The
objection was made that the evidence was immaterial and
the court excluded it on the ground that on the defendant's
own testimony the latter was not acquainted with José Rosa
before the altercation, and that although the deceased might
have been a bad man, the defendant could not have known
it, and also by reason of the cases of *People* v. *Murray,* 10
Cal., 310, and *People* v. *Edwards,* 41 Cal., 640.

The bill of exceptions, besides omitting a copy of the of-
fered certificate, fails to show that any foundation was laid

for the question. The character of the dead man was not in issue. The evidence was offered, as the record shows, after all the other testimony in the case was given. It was incumbent upon the defendant, in order to introduce evidence of this nature, to show, or offer to show, that he knew of the bad character of the deceased. No such proof or offer was made, and the action of the court in rejecting the evidence was not error. (*Henderson* v. *State,* 12 Tex., 525; *Com.* v. *Straesser,* 153 Pa., 452; 26 Atl., 17; *Derkes* v. *State,* 11 Ind., 557; 71 Am. Dec., 370; see note to *State* v. *Feeley,* 3 L. R. A. [N. S.], 359.)

Much stress is laid on the alleged faulty reasoning of the court in excluding the testimony, inasmuch as although the defendant did not know Rosa, yet he might have known of the dead man's turbulent or dangerous character. The words of the court, in Spanish, are as follows: "*Niego la admisión de la prueba que se propone por la defensa, fundándome en que, según la propia declaración del acusado, no conocía a José Rosa antes de ese momento y el que fuera un hombre malo, no podía saberlo para actuar bajo aquella influencia, y en esos casos no es admisible la evidencia,*" etc. We think it is a fair inference, from the use of the words, possibly a little inverted in the record, "*el que fuera un hombre malo*" and the state of the testimony, that the court had also in mind the question of Sutton's knowledge of Rosa's dangerous character. The nature of the grounds of a ruling may be gathered from all the circumstances. Be that as it may, the giving of false grounds for rulings of this character is no reason for reversal when it is clear that the evidence was properly rejected.

The other ground of error alleged is that the court did not give proper consideration to the defendant's plea of self-defense according to its legal effect. This objection must mean that the conclusion of the court in finding defendant guilty of voluntary homicide was not warranted by the evi-

dence. The material testimony given in this case is as
follows:

Flora Rosa, the sister of José Rosa, testified that her
brother sent her to gather some beans while he went off
to get some *yucas,* which is a kind of root, and as he was
pulling them up the American came up and accosted him and
immediately the witness heard a shot and ran toward her
brother, who was already dead, and the American went off
with the revolver in his hand; that the eldest child of the
dead man was there and the witness saw the old man, Bar-
tolo, and there was no one else; that her brother fell on his
face, said no word, and died on the spot.

On cross-examination the witness said that her brother
was pulling *yucas* with his hands because the soil was sandy
and he did not have a knife; that she did not see the Ameri-
can come up, not until he was speaking to her brother, and
that they were speaking neither low nor loud; that the wit-
ness was half a *cuerda* (about 100 feet) away; heard the
sound of the voices, but not the words; when the witness heard
the shot she looked over to where her brother was and saw
him fall, and the American run; that the witness, the daugh-
ter of the dead man, and no one else were present.

On being examined by the judge, she said that the plants
from which the beans were being taken were very large and
did not allow her to see her brother very well, these plants
being between her and the place where her brother was; he
was alone in pulling up the *yucas;* that she did not take
notice of the approach of the American until he was speak-
ing to her brother, and she continued picking the *gandules,*
and it did not take long before the shot was heard; and right
away her brother fell to the ground with his face looking
downwards; and the witness came up, and he (meaning the
dead man) did not have in his hands or about him anything
but the *yucas;* that the American referred to is the defendant.

Juana Rivera testified that she is the mother of the wife
of José Rosa, in whose house she was aiding her daughter,

about to give birth to a child; José Rosa lived on the estate of Mr. Sutton, on a piece of land rented by him and in a house on the place where all of them lived. On the day of the happening José Rosa was planting some *yautías* (a kind of root) and afterwards went to pull up some *yucas* to give breakfast to the family, and defendant came up and stepped forward and slapped José Rosa, who put his arms around his (Sutton's) waist, and then the American fired a shot and killed him, the death being immediate, and the American went off with the revolver in his hand; José Rosa went forward to the American, making a demonstration against him (*amagándole*) and putting his hands on him, and when he did put his hands on, the American shot him.

Cross-examined, she says that she was in the kitchen of José Rosa's house and through a hole in the kitchen (which is made of *yaguas*) saw the American speaking to José and the witness went out and saw her son-in-law falling and the American running away, and the witness screamed and the people came running up; the sister of José Rosa and one little girl were further away from the house, and there was another little girl, both children being with their aunt, Flora Rosa, all of whom ran when they heard the shot; José Rosa and the defendant had only a few words and they did not have a fight (*y no hubo lucha entre ellos*). José Rosa was pulling up the *yucas* with his hands, and to work used a hoe which he left near the *yautías*.

On being questioned by the judge, she said that the kitchen is built up, "or fenced," with old *yaguas,* with nothing but a door without shutters, and the witness was there when the defendant spoke to José Rosa, and on hearing the voice of the American went out in the yard; they spoke a few words (*dos palabras*) which witness did not hear, and when the American spoke José Rosa straightened himself up and the American gave him a slap; then José Rosa put his hands on the American's waist and the latter shot, José Rosa running off and falling; from the place where Flora and the

children were picking beans they could not see José Rosa because they were in back (of the bushes).

Bartolo Arroyo testified that he lives on the same estate, and on March 11, 1908, arrived about 3 o'clock in the afternoon, and that his house is 20 yards away from the house of José Rosa, and when the witness went by, Rosa, with one of his little girls, was pulling up *yucas,* and the witness after arriving at his house heard José Rosa speaking and put his head out of the window and saw Mr. Sutton arriving and saying something in a low voice to José Rosa, and when the latter met him the American struck José Rosa a blow; the latter stepped back, and the American put his hand in his breast; José sprang forward to catch him and the witness ran over, and on coming up to them the shot was fired and Rosa fell down between two stakes; José was the one who sprang to seize the American; the American went away with the revolver in his hand after the shot.

Examining the revolver showed by the *fiscal,* says the one the defendant had was like it.

On cross-examination he said that José Rosa was on all-fours grabbing the defendant to prevent him from pulling out the revolver. The American had one hand outside and the other inside his breast, where he had the revolver; the two were on all-fours, and José Rosa with his two hands had the American caught by the arm. José Rosa was pulling up *yucas* with his hands, but had no weapon, and about him were no knives nor anything else. Flora Rosa and a little girl were there, and Juana Rivera at the kitchen stove making a broth; this the witness knows, because she screamed.

The witness reproduced his statements graphically before the jury, explaining the way in which the events occurred, taking the accused and grappling with him in the same manner in which he saw him with José Rosa.

José González testified that he lived, on March 11, 1908, on the same place as José Rosa, which is an estate managed by Mr. Sutton. He was just going around it and saw when

the American met José Rosa, grabbing each other, José Rosa going toward his home and the other in the opposite direction. While in the struggle the American pulled out his revolver and shot José, who fell dead, the American running away toward his home. The estate is divided by a street, and at the mouth of same there is a wire, and on the other side there is another. He did not notice whether José had any knife or not.

(Being asked by the attorney, he says that the accused had the revolver inside of the waistband of his pants, and took it out and shot.)

Dr. Manuel Fosas practices his profession at Bayamón, and on the 11th of last March made the autopsy of José Rosa, who died from the hemorrhage of a bullet wound which passed through his breast and his lungs, whose death must have occurred instantly.

This was all the testimony of the prosecution.

Dr. Manuel Fosas continued, testifying as a witness of the defense, and said that on the day referred to by the *fiscal* he saw the defendant about 5 o'clock in the afternoon, observing several wounds that he had which were superficial, like scratches, made by an instrument somewhat blunt. Some of the wounds were filled with dirt, and the witness believes that this dirt was caused by falling on the ground after the defendant was wounded or because the weapon with which he was wounded was full of dirt. In two or three of the wounds the witness observed that there was dirt inside them. They could have been made with a blunt instrument like a dull knife; that the clothes of the defendant were slashed in the same way as the wounds.

At this point the attorney of the defendant offered the clothes as evidence without opposition on the part of the *fiscal,* and the court admits the evidence.

The witness said that these clothes were the same which the defendant had on on the day of the event, and in the shirt there is a hole as if made by a bullet, and a burn which

corresponds to the hole. The defendant had five wounds, some on the side and on the thighs and others on the back corresponding to the cuts on the clothes. Being asked by the *fiscal* he said that such wounds as were on the back could have been made by barbed-wire fence, but not the wounds on the thighs; that the cuts on the shirt could have been made by the wire fence, and also could have been made in a fight with another person.

On being again asked by the defendant's attorney, witness said that the wounds in back could have been made by a wire fence or by a blunt knife.

Being asked by the judge, he said that he examined the defendant in town about 5 o'clock in the afternoon; the *finca* being about 10 minutes' walk from there; the wounds were superficial and irregular, were jagged and could have been made with a knife or a weapon not very sharp, which also could cut the clothes, by using force; such wounds could have been made with a knife that was not very sharp, but to cut the cloth of which the clothes were made would need a strong man; that the cut on the right leg of the trousers could be made either by a sharp knife like a *machete, espadín* (curved form of *machete*), *hoja de sable* (practically the same as *espadín*), or a table knife, and force would have to be applied from different directions.

D. A. Skinner testifies that he is Assistant Secretary of Porto Rico; that he knew the defendant and had known him since 1901 as a man of good conduct, not having taken part in any fights or quarrels; considers the defendant as a man of good behavior, who devotes himself to his work.

On being asked by the *fiscal,* he says he met the defendant first in Ponce, and he is his friend and considers him a gentleman.

Ezequiel Mongil testified that he is chief of police at Bayamón; in March last, on the day of the event, the witness was in his office and a negro came in saying that José, the godfather of his son, had been killed; in company with

the judge he went to the place and found José Rosa on the ground and Mr. Sutton away from him; the latter had already been arrested by the police, who took his revolver. There was quite a big crowd commenting on the event; the witness ordered that the defendant be brought to town and the dead man sent to the cemetery, and when they arrived at the town Dr. Fosas went by the police headquarters; the witness called him and he came in and examined the defendant, for which purpose he made him take off his clothes; the witness saw that the defendant had several scratches.

On being asked by the *fiscal,* he does not remember how the defendant was dressed, but he was in his working clothes, full of dirt, and his hands dirty.

Césaro Fernández testified that he knows the defendant and that he knows José Rosa, and saw them on the day of the controversy. The witness was cleaning up his farm, and the defendant passed in back of him and saluted him while he was busy in cleaning up sugar-cane. He heard a disturbance and saw some colored people who were three struggling with the defendant; at first the witness did not know who it was because he was hidden in the middle, and in that moment they pushed him and one of his legs was shown and by the trousers the witness realized that it was the defendant, and he heard a shot and the one who had hold of the defendant let him go and took a long stride and fell to the ground and the others ran away; then the defendant also ran, with his shirt torn and hanging down in shreds.

On being asked by the *fiscal,* he says he was quite distant from the place of the event, and between the witness and that place there were several stocks of sugar-cane ready to be cut for grinding, and over the top of the sugar-canes the witness could observe. The sugar-canes and those who were struggling were on level ground, and there was quite a large number of sugar-canes and they belonged to the witness; he had bought them of a lady. There were some houses there, and one belonged to José Rosa and another to Bartolo

Arroyo, the first being a little distance from the group here concerned in the struggle, and the second nearer; José Rosa was the one who had the accused grabbed and the rest were grouped together, Bartolo being one. The witness did not know the rest of them, because he had only been living there a very short time.

On being asked by the *fiscal,* he said that Arroyo was not in the struggle with the defendant, but they were' together; that he cut the sugar-canes a month afterwards, and that he recognized the defendant by his yellow trousers, because a little while before he had passed beside the witness.

Jesús Pérez Martínez testified that he knows José Rosa and knows the defendant; that the first had a piece of land and a little house on the farm "Quinto," managed by the defendant. There were crops planted by José Rosa, but outside of the land which he had rented, and that they did not belong to him, which fact the witness knows because he was the collector of the estate. He knew about the event about half an hour after it occurred; saw the spot where Rosa fell, which was outside of the land which belonged to him; he knows the spot where Rosa was taking out *yucas* before the event, which was also outside the place he had rented.

Being asked by the *fiscal,* he said that Rosa paid his rents punctually, but does not know to whom the *yucas* belonged; that there were some large bushes of *gandules* at that place.

José Eraso testified that he was cutting canes on the estate when the event took place, which he did not see, and that Mr. Sutton, under whom the witness worked, sent him for the police at 3 o'clock in the afternoon, saying that he was wounded.

On being asked by the *fiscal,* he says that the defendant was near his house and he did not notice how he was dressed, because the defendant ordered him to go for the police because he was wounded, and he went and got them.

Being asked by the judge, he said that the police came with the lieutenant.

George Sutton testified that on the day of the event he was going around his farm, and on passing near where José Rosa lived saw him working on the ground and saw two more persons talking, of whom he asked "Who is planting?", and one of them answered, "I," and on being asked his name said, "José Rosa." He asked him where he lived, and he answered, "I live here," pointing out a little house which was a few yards away. The witness asked him when he was going to pay the rent of the land he occupied, and he answered that he did not owe anything; the witness replied that he owed for a *cuerda* since August, and he answered that he would not pay a cent. The witness said to him that he would have to give up planting, and that it was the first time that he met him, and that he had left various messages at his house; José Rosa said it was a lie, because no messages had been left at the house; the witness then insisted that he left such messages, and that he (Rosa) knew that everybody who planted would have to pay for each *cuerda;* Rosa replied, "*Carajo,* it is a lie," and at the same time took a step forward, striking the witness with his hands. The witness defended himself and felt a stroke from a pointed instrument (*puntazo*) and saw some blood. He continued struggling with Rosa in order to catch his hand, and when he got hold of it someone else caught him from behind and he felt a punch on the head; the witness put his hand inside of his shirt in order to get his revolver, and the third person caught him around the waist, holding his right arm, whereby he could not pull out his revolver. He continued to hold on to José Rosa, who was giving him knocks, and in this way the four of them continued clinching; the witness felt a cut in his foot, and raising the barrel of his revolver shot it off underneath his shirt, because, as he had already said, his arm was held by the other man, who is called José González, and he fired a shot and immediately all of them let go. José Rosa walked about 15 or 20 feet towards his house and fell on his face. Then the witness ran over to his house, called

the servant, José Eraso, to go for the police, because he was wounded. When he fired off the revolver he had it on the left side and fired if off in that way, and two people had hold of him, without being able to say if José Rosa had hold of him, too, because the witness was holding on to Rosa; saw in José Rosa's hands a piece of *machete*. José Rosa was taller and stronger than the witness; he delivered the revolver to the police; the wounds and scratches which the witness had on his body were caused by José Rosa in the struggle. After the event the witness did not go under any wire fence, and on that account he can assure anyone that the scratches were not made by the wire fence or by any other foreign body, but were caused by Rosa.

Being asked by the *fiscal,* he said that he came to the road by the place called "Cachete," which has one side fenced; the witness was inside of the estate and through it came out by a lane to the main road. He did not go under any wire fence; he knows María Rodríguez, who lives in Comerío Street near to the place, and at that time she lived inside the "Cachete".

In response to the questions of the judge, he said that the fence is of barbed wire and of *malla* (a plant like pine-apple).

This concluded the proof of the defense, and then the *fiscal* offered evidence in rebuttal, which was admitted.

María Rodríguez testified that on the 11th day of March last she lived at "Cachete," and that there were several neighbors, among them José Rosa, who lived further out, and on that day she saw the defendant pass by the yard of her house with a revolver in his hands, through the wires, bending down his head; that there are three wires with barbs, and two of them were on the ground and another was up in place; that when the defendant went through a part of his clothes was torn in back, she not noticing whether it was from his back, the piece being left on the fence.

On questions propounded by the attorney she said that this information was brought to the ears of the *fiscal* because the detectives asked her if she had seen anything, and she answered that she had seen Mr. Sutton go under the wire fence with a revolver in his hands; that when she was asked by the detectives about it Mr. Sutton was not there and she could not tell the date in which this statement was obtained from her; but the date on which witness saw the defendant pass they say was the 11th of May, and she maintains that on that day, the 11th of May, she saw Mr. Sutton passing through the yard of her house.

In reply to questions from the judge she said that they told her that Mr. Sutton had killed Rosa on the day on which she saw him pass through the wire fence.

As we have seen, this case was tried by the court without a jury. When the court sits with a jury a review of questions arising during the trial is obtained by means of the preservation of exceptions, either to the admission or exclusion of evidence, or again, to the granting or refusal of instructions. In *Suydam* v. *Williamson*, 20 Howard, 433, the Supreme Court says:

"When a party is dissatisfied with the decision of his cause in an inferior court, and intends to seek a revision of the law applied to the case in a superior jurisdiction, he must take care to raise the questions of law to be revised and put the facts on the record for the information of the appellate tribunal; and if he omits to do so in any of the methods known to the practice of such courts, he must be content to abide the consequences of his own neglect. Evidence, whether written or oral, and whether given to the court or to the jury, does not become a part of the record unless made so by some regular proceeding at the time of the trial and before the rendition of the judgment. Whatever the error may be, and in whatever stage of the cause it may have occurred, it must appear in the record, else it cannot be revised in a court of error exercising jurisdiction according to the course of the common law."

In the course of English law from the days of Magna Charta the trier of facts in law cases, including criminal prose-

cutions for felonies, was the jury. In civil cases at law parties had and have a right to waive a jury trial. In such cases the court is substituted for the jury, and where the finding of the court is general it is invariably held that such finding must be given the same effect as the verdict of a jury. (*City of Richmond* v. *Smith,* 15 Wallace, 437; *Basset* v. *United States,* 9 Wall., 40; *Bond* v. *Brown,* 12 How., 255; *Miller* v. *Life Insurance Co.,* 12 Wall., 301; *Norris* v. *Jackson,* 9 Wall., 127; *Simmons* v. *Saul,* 138 U .S., 438; Henderson's Distilled Spirits, 14 Wall., 53; *Appel et al.* v. *Childress,* 116 S. W. [Tex.], 129; *Griffie* v. *McCoy,* 8 W. Va., 201, 19 Dec. Dig. Trial, 1334; Century Digest, Appeal and Error, sec. 3351, *et seq.,* and sec. 3987; Dec. Dig., sec. 846, *et seq.*) In *Basset* v. *United States, supra,* the court says:

"When a court sits in place of a jury and finds the facts, this court cannot review that finding. If there is any error in such case, shown by the record, in admitting or rejecting testimony, it can be reviewed here. But when the court, by permission of the parties, takes the place of the jury, its finding of facts is conclusive, precisely as if a jury had found them by verdict."

and in *Griffe* v. *McCoy, supra,* it is laid down (in the syllabus):

"Where a trial is held to the court, the court occupies the same relation to the facts in the case that a jury would have had if the case had been tried by a jury."

In felony cases within the United States, by reason of the Constitution of the United States and of the various State constitutions, a defendant may not waive his right of jury trial, but he may in minor offenses. (*Schick* v. *U. S.,* 195 U. S., 65.) The mode of review, in case of such a submission to a court following the course of the common law as shown in the Schick case, is necessarily the same as it would be in a civil case where a party had the right of a jury trial. In Porto Rico a defendant, by section 178 of the Code of Criminal Procedure, may elect in a noncapital case to be tried by

a jury, and if he doesn't so elect the right of jury trial is deemed to have been waived. That such waiver is no violation of the Constitution of the United States is a matter not open to question in this court. (*Ex parte* Acevedo, decision of June 2, 1902, 1 Castro, 275; *Trono* v. *U. S.*, 199 U. S., 533; *Dorr* v. *U. S.*, 195 U. S., 148.) It is evident from an examination of the authorities that when a case triable by a jury is submitted to a judge he is always substituted for such jury, and a review of a general finding made by him is governed by the same principles as in cases where there is a verdict. This becomes more evident by reason and authority in the consideration of the particular question sought to be reviewed here.

Numerous authorities can be found to the effect that the supreme court of a State will not review the facts to resolve a conflict in the evidence in the absence of partiality, passion, or prejudice or some like element. This rule has been followed by the Supreme Court of the United States.

In *People* v. *Vance*, 21 Cal., 404, the court, through Mr. Justice Field, says:

"The last objection of the appellant, that the verdict is against the weight of the evidence, is without force. There was evidence both for and against the defendant, and in such cases we do not interfere with the province of the jury. There must be such overwhelming evidence against the verdict as to justify the inference that it was rendered under the influence of passion, or prejudice, or bias of some kind, to justify any interference on our part with the action of the jury."

In *People* v. *Durrant*, 116 Cal., 200, the court cites a multitude of cases to the same effect, and says:

"If a witness should absolutely discredit his own testimony by swearing to opposite statements so that one or the other must be false, under our laws his testimony is not of necessity to be rejected. It is still evidence in the case. Under such circumstances the jury must receive and weigh it. They are bound to look upon it with suspicion and distrust, and may reject it. But, upon the other hand, they may as they determine accept as true one or the other of the contradictory

asseverations. Thus, upon a review of the evidence by this tribunal, we may not examine with minuteness claims that witnesses are discredited, or that their testimony is unworthy of belief, or look to see whether some other conclusion might not have been warranted by the evidence. (*Blyth* v. *Ayers,* 102 Cal., 254.) *Ad questionem juris respondeant judices, ad questionem facli respondeant juratores;* and than this no maxim of the old law has been more carefully preserved in its integrity under our system. Where it is not clear that the verdict must have been rendered under the influence of passion or prejudice, our examination of the record is only to determine whether legal evidence has been offered sufficient to warrant a conviction, for the verdict of the jury is their declaration that it is this evidence which has been by them accepted.''

In *People* v. *Brittan,* 118 Cal., 411, we find this statement:

''Nor was there, as claimed, any such disparity in the statements of the witnesses of the prosecution as to render their evidence inherently improbable or necessarily unworthy of belief. It was no greater, in fact, than is usually to be found in the statements of different eyewitnesses to an affair of the kind.''

In *Johnson* v. *United States,* 157 U. S., 326, the court says:

''The impression has been made upon us, by our examination of the evidence, that there was room for a reasonable doubt of the defendant's guilt: But the jury that found him guilty saw and heard the witnesses, and we must infer from the conduct of the court in overruling the motion for a new trial that it was satisfied with the verdict; and as we have found no error in the rulings of the court, the judgment in the case is affirmed.''

The Supreme Court of the United States consistently adheres to the principle. (*Crumpton* v. *U. S.,* 138 U. S., 361; *Moore* v. *U. S.,* 150 U. S., 61.) From a mass of jurisprudence on the subject we have selected the foregoing cases from California and the United States Supreme Court because they were all murder or homicide cases. The reports abound in other cases to the same effect.

The Supreme Court of New York in capital cases appar-

ently has wider powers than our own court. In *People* v. *Kerrigan,* 147 N. Y., at page 214, the court says: ·

"While this court has the power in a capital case to review the facts and to grant a new trial when satisfied that the accused has not had a fair trial, or when injustice has been done, it must observe the rules and principles which apply to all tribunals exercising appellate jurisdiction. It is the province of the jury to determine questions of fact, depending upon evidence in any degree conflicting, and to declare by their verdict what the truth is, and when once determined, upon evidence which is sufficient, even though capable of diverse or opposing inferences, this court has no more right than the trial court to substitute its own judgment in the place of that of the jury, or to usurp its legitimate functions."

Our own powers are governed by the laws of 1903 and 1904:

"Section 1.—That the Supreme Court of Porto Rico shall hereafter be a court of appeals and not a court of cassation. In its deliberations and decisions, in all cases, civil or criminal, said court shall not be confined to the errors in proceeding (procedure) or of law only, as they are pointed out, alleged or saved by the respective parties to the suit, or as set forth in their briefs and exceptions, but in furtherance of justice the court may also take cognizance of all the facts and proceedings in the case as they appear in the record, and likewise consider the merits thereof, so as to promote justice and right and to prevent injustice and delay." (Laws of 1903, page 59.)

"Section 1.—Whenever it appears from the record in any criminal case upon appeal in the Supreme Court that any requirement of the law has been disregarded by the trial court, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of either of the parties, and was duly excepted to in the trial court: *Provided, however,* That the appellate court may take cognizance of fundamental errors appearing in the record, although not excepted to, and render such judgment thereon as the facts and the law may require." (Laws of 1905, special session 1904, page 10.)

In a long line of decisions this court has uniformly followed the rule laid down by the Supreme Court of the United States and the Supreme Court of California. The question

was fairly presented to us in the case of *Leña Verde* v. *People of Porto Rico,* decision of March 6, 1907, where the court said as follows:

"It is a question which has been the subject of considerable discussion as to how far an appellate court will go in reversing a judgment on the ground that the verdict of the jury is not supported by the evidence. A great majority of the cases to be found in the books hold that the decision of a jury on the facts should not be disturbed on appeal. A minority of the cases have held, quite as consistently, that if the evidence is insufficient to sustain a verdict that it should be set aside on appeal. But the opinions in the cases very often fail to state how far an appellate court can proceed in considering the weight of the evidence in criminal cases on which the verdict of the jury is based. It would perhaps be very difficult, if not impossible, to deduce from the reported cases a rule on this subject which can be considered as having been adopted by all the courts. In Florida, Texas, and Illinois the courts have held that a reasonable doubt as to the guilt of the accused in the minds of the appellate court is a sufficient reason for the reversal of a judgment of conviction. In many other States, among them Idaho, Indiana, Iowa, Kentucky, Louisiana, Missouri, New York, and Virginia, it may be said to be the rule established by the decisions that a judgment in a criminal case will not be disturbed on the ground that the verdict is not supported by the evidence, except in cases where there is a total failure of evidence, or it is so weak and unsatisfactory that the necessary inference to be drawn therefrom is that the verdict is the result of partiality, passion, or prejudice. The latter rule has been upheld by the Supreme Court of the United States in the case of *Crumpton* v. *United States,* 138 U. S., 36. And in California it is announced as the decision of its court of last resort that only questions of law can be considered on appeal, and if there is any evidence to justify the verdict of the jury it cannot be disturbed. (*People* y. *Williams,* 59 Cal., 674; *People* v. *Smallman,* 55 Cal., 185.)

"This matter is discussed, though briefly, in a note to the case of *Armstrong* v. *The State of Florida,* to be found reported in 17 Lawyers' Reports Annotated, on page 484. We concur in the rule laid down by the Supreme Court of the United States in the case referred to above, that the weight of the evidence introduced by the State, to the extent to which it was contradicted or explained away by the witnesses on behalf of the defendant, are questions exclusively for the jury and

not reviewable upon error in the appellate court. If the verdict was manifestly against the weight of evidence, defendant should have moved for a new trial on that ground in the court below, but the granting or refusing of such a motion is a matter of discretion in the trial court. It may be said generally that this court will not review the decision of the jury upon a question of fact, unless it is clearly erroneous or the result of partiality, passion, or prejudice.''

We have decided the same in many other cases, of which the following may be cited: *People* v. *Otero,* 4 P. R., 107; *People* v. *Villegas et al.,* 6 P. R., 460; *People* v. *Goitía,* 5 P. R., 252; *People* v. *Sinigaglia,* opinion of June 27, 1907; *People* v. *Díaz,* opinion of February 1, 1910.

*People* v. *Sinigaglia* was a case tried by the judge below and, quoting California decisions, is also authority to the effect that it makes no difference whether a review of the evidence is sought by appeal from the judgment or from the order denying a new trial.

In the Durrant case, *supra,* and *Moore* v. *U. S., supra,* the court supports its application of the principles by citations alike from civil and criminal cases, and in *Shorter* v. *People,* 51 Am. Dec., 293, the court says:

''As this is a criminal and a capital case, I cannot but feel a strong disposition to give the prisoner a new trial. But the law concerning bills of exceptions is the same in criminal as it is in civil cases (*The People* v. *Wiley,* 3 Hill [N. Y.], 194, 214,), and we must not allow our feelings to draw us into the making of a bad precedent.''

This court in a recent case again reviewed the authorities and citing civil and criminal cases said:

''It is claimed by the appellant that the verdict of the jury is contrary to the evidence, and a great effort has been made to show this by comparing the testimony of the several different witnesses, one with another, and pointing out alleged contradictions in the various parts of the testimony of particular witnesses, and especially in that of the prosecutrix and her brother. There is, no doubt, considerable conflict in the testimony of the different witnesses as compared with each other, and some inconsistencies in the several statements made by some of the witnesses for the prosecution. This occurs in nearly all

closely contested criminal trials. But it is the province and the duty of the jury, under proper instructions from the court, to weigh the evidence and reconcile, so far as possible, the inconsistencies or the contradictions in the testimony, and to sift the grain of truth from the mass of chaff which may be found therein, and thus arrive at a just verdict founded on the facts proven. So far as we can see from a careful perusal of the record and the briefs, this duty has been fairly performed by the jury; and we do not feel justified in saying that any error has been committed in this particular. Another jury on the same facts, under proper instructions, might arrive at an entirely different verdict, which we might feel the same hesitation to disturb." (*People* v. *Español*, March 30, 1910.).

The same test is generally applied where the court below had the witnesses before it. The rule is not based on arbitrary tradition, but on principles of common sense and common justice. In *Quevedo* v. *Succession of Pino*, opinion of November 16, 1909, this court said:

"We have often held that the trial court possesses facilities for weighing the evidence and determining the credibility of witnesses which neither this nor any other appellate court, in the nature of judicial proceedings, can command; and that in cases of conflicting testimony we will be very reluctant to disregard the findings of the trial court on such questions."

This court in that case had previously made an extensive citation from the Supreme Court of Mississippi wherein the latter court set out all the human manifestations that the court below might see or hear and which necessarily could not be reproduced in a dry record, any one of which might determine the weight of a bit of testimony or the credibility of a witness.

Before examining the facts in the case it will be well to set forth the law with respect to the right of self-defense in homicide cases. Our own laws provide:

"Sec. 209.—Homicide is also justifiable when committed by any person in any of the following cases:

"1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or,

"2. When committed in defense of habitation, property, or person against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; or,

"3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony, or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mortal combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed; or,

"4. When necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace.

"Sec. 210.—A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of the preceeding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.

"Sec. 211.—The homicide appearing to be justifiable or excusable, the person charged must, upon his trial, be fully acquitted and discharged." (Penal Code of P. R., pp. 521-522.)

Operating under substantially the same provisions the Supreme Court of California has sustained the following instructions:

"A person may repel force by force in the defense of person, property, or life, against one who manifestly intends or endeavors, by violence or surprise to commit a known misdemeanor or felony, or either, or to do great bodily injury to his person, and the danger which would justify the defendant in the act charged against him may be either real or apparent, and the jury are not to consider whether the defendant was in actual peril of his life or property, but only whether the indications were such as to induce a reasonable man to believe that he was in such peril of person or property. And if he so believed reason-

ably, and had sufficient cause so to believe, and committed the act complained of under such belief, even though it should appear that the deceased was not armed, you should acquit the defendant." (*People v. Glover,* 141 Cal., 233.)

Other judicial pronouncements under similar provisions of law are as follows:

"It was correctly said by Ruffin, C. J., in *State* v. *Scott,* 4 Ired. L., 409 (42 Am. Dec. 148), that 'the belief that a person designs to kill me will not prevent my killing him from being murder, unless he is making some attempt to execute his design, or at least is in an apparent situation to do so, and thereby induces me reasonably to think that he intends to do it immediately.' The 'situation' spoken of is not that he has the means at hand for effecting a deadly purpose, but that, by some act or demonstration, he indicates at the time of the killing a present intention to carry out such purpose, thereby inducing a reasonable belief, on the part of the slayer, that it is necessary to deprive him of life to save his own. *Pritchett* v. *State,* 22 Ala., 39 [58 Am. Dec., 250]; Whart. Crim. L., 260." (*Harrison* v. *State,* 60 Am. Dec., 452.)

"It is clear that to establish a case of justifiable homicide it must appear that something more than an ordinary assault was made upon the prisoner; it must also appear that the assault was such as would lead a reasonable person to believe that his life was in peril. *Wallace* v. *U. S.,* 162 U. S., 466." (*Allen* v. *U. S.,* 164 U. S., 498.)

"Neither, fourthly, do we find anything to condemn in the instructions in reference to self-defense based on an apparent danger. Several approved authorities are quoted from in which it is not sufficient that the defendant claims that he believed he was in danger, but that it is essential that there were reasonable grounds for such belief, and then the rule was summed up in this way:

"'Now, these cases are along the same line, and they are without limit, going to show that, as far as this proposition of apparent danger is concerned, to rest upon a foundation upon which a conclusion that is reasonable can be erected there must be some overt act being done by the party which, from its character, from its nature, would give a reasonable man, situated as was the defendant, the ground to believe—that there was danger to his life or of deadly violence to his person, and unless that condition existed then there is no ground upon which this proposition can stand; there is nothing to which

the doctrine of apparent danger could apply.'" (*Acers* v. *U. S.*, 164 U. S., 392.)

"One may defend himself and his family with deadly weapons from a felonious assault, if necessary to protect the same therewith from such assault, and may also defend his habitation from such character of assault by the use of like weapons if necessary to preserve the same from destruction or serious injury; but a nonfelonious assault upon one's person, family, or habitation—that is, an assault not made under such circumstances, and with such means, and under such appearances, as to justify a belief in imminent danger of great bodily harm to person, or destruction or serious injury to habitation—may not be resisted with deadly weapons." (*State* v. *Countryman*, 48 Pac., 138.)

"When a man is struck with the naked hand, and has no reason to apprehend a design to do him any great bodily harm, he must not return the blow with a dangerous weapon." (*Shorter* v. *People*, 51 Am. Dec., 292.)

"If deceased intended to take the life of defendant, or to do him some enormous bodily harm, it would be lawful for him to kill his assailant if he could by no other means prevent the assault. But if the deceased intended only a simple nonfelonious assault, such as chastising or whipping the defendant, and defendant killed him to prevent such assault, it would be at least manslaughter." (*State* v. *Benham*, 92 Am. Dec., 417.)

"The court further charged the jury that 'disparity of physical power and strength between men will not justify the weaker party in suddenly, and without any warning, resorting to a deadly weapon and using it in a deadly manner when menaced and threatened with an assault by or with fists alone; and unless the situation and condition of the parties, and the circumstances under which they are placed, are sufficient to induce a man of reasonable and ordinary prudence and judgment to believe great bodily harm or injury might reasonably be expected to follow if the menaces and threats be carried out, in which case the prisoner had a right to use such deadly weapon.'" (*State* v. *Thompson*, 74 Am. Dec., 344.)

From the evidence transmitted to us in the record the trial court had a right to believe that Sutton began the conflict by slapping Rosa; that the dead man, Rosa, had no weapon; that Rosa was merely trying to prevent Sutton from using his revolver. The court had a right to believe from the evidence

that the cuts on Sutton's body were produced by the barbed-wire fence; that the same cuts were produced in some other way than in the conflict, as, beyond the statement of Sutton (which is negatived by the government's witnesses) there was no evidence that Rosa had the means in his hands or in his possession of inflicting the wounds which the defendant and Dr. Fosas, described; indeed, a judge or a jury, where no antecedent event is described to cause a particular injury, would have a right, where the injured person is not examined immediately after the affray, to believe that the result described, like the cuts, in this case, was produced in a number of ways, and might even be self-inflicted.   Even if the cuts were caused by Rosa in the conflict, the court had a right to infer that Rosa used his weapon, if any he had, to prevent Sutton from using his pistol.  The court had the right to believe, even if Rosa was the aggressor, as Sutton maintains, that the latter unduly resented the blow and took advantage of his assailant.  These are some of the many theories suggested by the evidence, and the court, following the authorities, had ample justification for its finding if it believed that Sutton had no reasonable ground to fear for his life or great bodily harm.  This it might readily do, if it believed the witnesses of the Government, and especially the witness Bartolo. If this court were in any doubt as to the sufficiency of the evidence it still could not reverse this case because means of proof which were submitted to the court below have not been brought before us, namely, the clothes which Sutton wore and which the doctor described as having cuts which followed the same general lines as the scratches themselves.  The clothes were not brought up as an exhibit, nor was there any attempt made to give a sketch of them other than in the testimony of Dr. Fosas.

The court also had a right to discredit the testimony of any witness from his manner of testifying, and the judge had the right to use his eyes and observe the character of the cuts

on the clothes submitted to it. The court was not bound to follow some of the indications of the expert that the wounds were produced in some other way than by the barbed-wire fence. A barbed-wire fence is quite capable of producing severe wounds if one goes under it hastily and forcibly, a fact well known to people who have to handle cattle.

It is suggested by counsel that the statements of some of the witnesses for the government are contradictory and at variance with some of the admitted facts, but it is a familiar experience in homicide and accident cases that the most honest witnesses will be mistaken about a part, or even a great part, of their testimony. It is the province of the trier to sift the truth. The testimony, for example, of the mother-in-law of Rosa is vague in parts and in contradiction to that of some of the other witnesses. This state of her testimony might be due to her age or excitement, but the court had a right to give credence to that part of her testimony tending to show that Rosa was unarmed. The testimony of Bartolo Arroyo, on the other hand, has no apparent inconsistency, and is only attacked in the brief of the appellant to state something that does not appear anywhere in the record. It is suggested, moreover, that Sutton was attacked by three men, but even if the court believed that there was a struggle of three against one there was nevertheless evidence tending to show that the struggle of the four people arose after an act of aggression on Sutton's part. The court would also have had a right to believe that the struggle arose after Sutton attempted to draw his pistol.

We have examined the evidence with great care, and not only do we not find such a preponderance of the evidence in favor of the appellant as would justify us in holding that the court was actuated by passion, prejudice, partiality, or even by an erroneous conception of the significance of the evidence, but we do not see, from the record, how the court could have arrived at any other conclusion.

The real reason for this decision is that this court has no

right to reverse in cases of conflict in the testimony where there is evidence tending to prove the information and no prejudice or similar element is shown. But it is suggested that, in the opinion of the court, it is shown that the judge did not give due consideration to the defendant's plea of self-defense. No such conclusion can properly be drawn from the opinion, but in any event the opinion forms no proper part of the record. (*Saltonstall* v. *Birtwell*, 150 U. S., 419; *Insurance Co.* v. *Tweed*, 7 Wall, 51; *Rector* v. *Ashley*, 6 Wall, 148; *Gibson* v. *Chouteau*, 8 Wall, 317; *Medberry et al.* v. *State of Ohio*, 24 How., 414; *Dickinson* v. *Planters' Bank*, 16 Wall., 250; *Insurance* v. *Boon*, 95 U. S., 140, citing other cases: *British Queen Mining Co.* v. *Baker Silver Mining Co.*, 139 U. S., 222; *Lehnen* v. *Dickson*, 148 U. S., 74; *Phenix Ins. Co.* v. *Fuller*, 40 L. R. A., 409; *Pennsylvania Co.* v. *Veisten*, 15 L. R. A., 798; *Hernández* v. *García*, 3 Castro, 181.)

In *Rector* v. *Ashley, supra,* the court said:

"We have of late been frequently urged, in this class of cases, to look into the opinions delivered in the State courts to ascertain on what grounds their judgments were based, and the point has been one of some controversy. It is not, however, an open question. More than 40 years ago the same question arose in the case of *Williams* v. *Norris,* reported in 12 Wheaton. The proposition was pressed upon the court for the same reason that it is in this case, namely, that by the statute of the State the opinions of the court are required to be filed in writing among the papers of the case. Marshall, C. J., speaking for the court, held that, notwithstanding this act, the opinion of the State court constituted no part of the record, and could not be looked to as the foundation on which this court would take or refuse jurisdiction."

In *Dickinson* v. *The Planters' Bank, supra,* the court said:

"Some facts, indeed, are stated in the opinion of the court that seem to have accompanied the judgment, but they are not stated as a special finding. They are rather advanced as reasons why the judge came to the conclusion that the alleged promise of the defendants had not been proved. It is impossible to regard anything that appears in this case as equivalent to a special verdict."

In *Insurance Co.* v. *Boon, supra,* the court said:

"Nor will the fact that the court below stated some of the facts in an opinion accompanying the judgment alter things in the least, it appearing that the facts exhibited in the opinion were stated, not as a special finding, but rather as a ground to show why the judge came to the conclusion set forth in the record."

In a note in 15 L. R. A., 798, the reporter points out that the Supreme Court of the United States has not always been consistent. That court has sometimes, it is true, looked at the opinion of the court below to see whether a federal question was raised, but not to decide the merits of an issue raised by the pleadings and on which the judgment was founded. In the very recent case of *The City of Memphis et al.* v. *The Cumberland Telephone and Telegraph Co.,* opinion of December 12, 1910, the court was divided as to whether the opinion of the court could be looked at to determine whether a federal question was involved, the majority holding in the negative. The case of *Loeb* v. *Columbia Township Trustees,* 179 U. S., 472, was relied upon by all the justices. In that case the court makes it clear that the opinion of the court below will not be referred to for the purpose "of ascertaining the evidence or the facts found below upon which the judgment was based." The same result flows from a consideration of our own statute. Section 356, Code Criminal Procedure, as amended, Session Laws 1908, page 90, reads as follows:

"Upon the appeal being taken, the secretary of the court with whom the notice of appeal is filed must, within 20 days thereafter, in case the bill of exceptions has been signed by the judge before the giving of such notice, but if not, within 20 days from the signing of the bill of exceptions, transmit to the secretary of the Supreme Court six typewritten copies (one of which shall be certified to as the original) of the notice of appeal and of the record of the case which shall consist of: First, the information; second, defendant's pleading; third, the court's instructions to the jury, should trial be a jury trial; fourth, instructions refused, if any; fifth, the verdict; sixth, motion for a new trial, if any, and the court's decision; seventh, judgment and sentence; eighth, bill of exceptions, if any; ninth, state-

ment of facts, if any; tenth, notice of appeal; eleventh, clerk's certificate stating that the copy is a true one of the originals existing in the archives of the court. Upon receipt of such record it shall be the duty of the secretary of the Supreme Court to enter the case upon the docket of his court."

There is no requirement for an opinion or findings of fact, because, of course, a verdict or a general finding is presupposed. Here there was a general finding by the judge, and his opinion was filed to support his conclusion. It does not purport to be a finding of facts; there is a duly certified statement of the case, and, under the authorities heretofore cited, the proper way to review the facts is the one authorized by law, namely, a bill of exceptions or statement of the. case. We are limited by the law of our jurisdiction to the "record." (Laws of 1903 and 1904, *supra.*) In this regard the Supreme Court of the United States held:

"While it is not necessary, we deem it well to say that in reviewing the action of the court below we are, of course, confined to the record and the case therein made, and may not, as the result of mistaken suggestions as to the issues and proof disregard our duty by deciding, not the case as made, but an imaginary one, wherein issues not made and not presented below would have to be supplied, and whereby conjecture and surmise must be indulged to replace the total absence of all proof on a particular subject." (*Roura* v. *Government of Philippine Islands*, 218 U. S., 400.)

Examining the opinion, nevertheless, we see that the court was directly considering the question of self-defense. The opinion is as follows:

"Before rendering my verdict in this case I want to state several facts, and especially one among them, to whose statement I am led not only by the oral testimony but also and chiefly by ocular inspection.

"From all the evidence introduced in this case I arrive at the firm conclusion, and without any reasonable doubt whatever, that on the 11th of March of this year and in the neighborhood of the town of Bayamón, of this judicial district, George Sutton, who was in charge of a farm, a portion of which was leased to José Rosa, met the latter at a moment when he was digging out some *yuca* roots, in

which task he was using no sharp tool, had not it on him, nor had he any near him. That in such circumstances and on account of the rental a quarrel arose between George Sutton and José Rosa, in which the former attacked the latter and a hand-to-hand fight ensued. And during said fight the accused, George Sutton, using a revolver which he had under his shirt, and without taking it out, but raising the barrel a little, fired a shot which, wounding José Rosa through the heart, caused his death almost instantaneously; after which the accused fled, having to cross, as he did cross, on his way, through a barbed-wire fence, the barbs of which caused some scratches on his body and tore his garments accordingly.

"And on this point what we wish to state emphatically is that the impression left on us by the examination of the tearing of those garments, which have been introduced as evidence by the accused, is that said tearing was caused by the barbs of the wire and by nothing else.

"The doctor who examined Sutton a few hours after the event which took place between Sutton and Rosa admits that the scratches or wounds with dirty edges made on the back, shoulders, and legs of the accused, could have been caused by barbs of barbed wire or by an instrument with a blunt edge.

"Between such conjectures the court decidedly is of the opinion that the tearing of the garments, corresponding to the wounds or scratches found on the accused, were not caused by a knife or similar weapon, blunt or not very sharp, but by barbs of barbed wire.

"We have very carefully examined the tearing of these garments, and by the shape of the several pieces torn off we are of the opinion, and firmly believe, that they were not produced in any other way than that already stated, because otherwise those cuts would not have had the irregularities shown, but would have presented a line more or less regular in its edges, according to the weapon with which they were inflicted.

"And besides, the accused, who is the only one to make mention of a weapon in the hands of the deceased, does neither state positively that fact, nor has he been able to give an idea of the kind of weapon that the latter had.

"And this conviction existed in my mind previous to the testimony of the witness, María Rodríguez, corroborating said interpretation, when she asserts that she saw the accused while he was passing through the barbed-wire fence and had his garments torn to such an extent that some pieces torn off from his shirt remained on the barbs of the wire.

"From the foregoing we are of the opinion that the accused is guilty of the crime of voluntary manslaughter with which he has been charged, and that when he committed the deed imputed to him he did not do it in self-defense."

It becomes evident that the court did not believe the evidence of the defense, but examined the clothes and became convinced that the scratches were produced by the barbed-wire fence and in no other way, and that Rosa had no weapon. The judge considered that Sutton did not fire in self-defense.

There is nothing in the record or the opinion which indicates that the court did not give due consideration to every legal question involved, and nothing before us to suggest passion, partiality, prejudice, or other error. The judgment must be affirmed.

A motion for a new trial was made in the court below and overruled, and an appeal also taken from this order. As the sole ground of the motion was that the decision (*declaratoria*) was contrary to the evidence, the order must be affirmed on the same grounds as the judgment.

*Affirmed.*

Chief Justice Hernández and Justice del Toro concurred.
Mr. Justice MacLeary dissented.
Mr. Justice Aldrey took no part in the decision of this case.

DISSENTING OPINION DELIVERED BY MR. JUSTICE MACLEARY.

Not being able to agree with my colleagues in the judgment of affirmance rendered herein on the 31st ultimo, it becomes my duty to set forth the reasons which impel me to dissent.

On March 20, 1908, the *fiscal* of the District of San Juan presented an accusation against George Sutton, charging him with the commission of voluntary homicide, or manslaughter, by illegally causing the death of José Rosa.

The trial was held before the Second Section of the District Court of San Juan, which, after having heard the evi-

dence and the arguments of the counsel for the respective parties, declared the defendant guilty of the crime set forth in the information. No jury was demanded and the case was tried by court alone.

The defendant moved for a new trial on the ground that the declaration of his guilt was contrary to the law and the evidence; and, having overruled this motion, the trial court, on December 16, 1908, rendered a judgment condemning the accused to five years' imprisonment in the penitentiary.

From this judgment the defendant took an appeal to this court and presented here a transcript of the record, in which there appears the information, the judgment of conviction, and the opinion of the trial court, besides a statement of facts and a bill of exceptions, duly prepared and certified. This transcript was filed here on March 30, 1910.

By our statute, section 178 of the Code of Criminal Procedure, it is prescribed that issues of fact in felony cases, such as this, shall be tried by a jury when the defendant so elects, and that such election shall be announced to the court at the first general call of the calendar upon which the case has been noted. This election or the waiver of the jury is required to be duly entered of record. It seems from an entry made in the record, at the top of the third page thereof, that on his arraignment the defendant pleaded not guilty and asked to be tried before the court. Whatever informality may appear from this entry it is not important and no complaint was made by the defendant that he was tried by the court without a jury, either in the court below or in this court. If any error was committed in regard to this matter it was waived, even if it was material, which it does not seem to have been. It is mentioned here only to remark that it is much the better practice to follow the law closely in all its provisions, whether the same are mandatory or merely directory.

An error of law is alleged to have been committed on the trial in excluding from the evidence a certificate from the superintendent of prisons, proving the character of the de-

ceased, José Rosa, and his penal antecedents, and that he had always been a disturber of the peace; and the defendant further claimed that the document would show what punishment he had undergone. This certificate was refused consideration because, as stated by the trial judge, the defendant, according to his own testimony, was not acquainted with José Rosa before the fatal altercation, and that although the deceased might have been a bad man, the defendant could not have known it, so as to have acted under that influence and that in such cases evidence of character is not admissible. The trial judge states, in the bill of exceptions, that he bases his ruling on two California cases, to wit: *The People* v. *Murray,* 10 Cal., 310, and *The People* v. *Edwards,* 41 Cal., 640. To these authorities the *fiscal* of this court, in his brief, adds two more: *The People* v. *Henderson,* 28 Cal., 465, and *The People* v. *Powell,* 87 Cal., 364.

Then the first question presented for our consideration is: Ought the trial court to have permitted the defendant's counsel to prove the bad character of the deceased, as a disturber of the peace, and that he had served a term in prison as such?

In cases tried before the court alone without a jury it is the general practice, followed by the courts on the Continent, to admit all the evidence offered by the accused, within reasonable limits, because the court, in considering all the testimony together, can eliminate such as is impertinent, being the better able to separate the wheat from the chaff after hearing all the facts presented on both sides. *Fiscales* in such cases can better make their objections to the effect of objectionable facts than to their admissibility as proof.

The same practice obtains in civil and criminal cases under similar circumstances. It is then, in my opinion, much the safer practice, when a case is being tried before the court without a jury and evidence is offered whose admissibility is doubtful, to allow it to be introduced and to consider it carefully in connection with the other testimony, and should it be

found irrelevant or otherwise improper, it can then be excluded from consideration without detriment to the rights of either party. (*Belber* v. *Calvo,* decided May 19, 1910; *People* v. *Rosado,* decided May 31, 1910.)

But the question of the admissibility of this evidence is squarely presented here and should be decided by us in accordance with the proper principles of criminal practice, as they are enunciated in the standard authorities on that subject. I will then examine them, and first those cited by the prosecution.

These are all California cases, and the most important paragraphs will be quoted from each of the four opinions. They read *verbatim* as follows:

"The other point made is, the exclusion of evidence of the character of the deceased for turbulence, recklessness, and violence. The rule is well settled that the reputation of the deceased cannot be given in evidence, unless, at the least, the circumstances of the case raise a doubt in regard to the question whether the prisoner acted in self-defense. It is no excuse for a murder that the person murdered was a bad man; but it has been held that the reputation of the deceased may sometimes be given in proof to show that the defendant was justified in believing himself in danger, when the circumstances of the contest are equivocal. But the record must show this state of case." (*People* v. *Murray,* 10 Cal., 311.)

"The court having refused to permit defendant to prove by McIntire, Ford, Harford, and others, that at the public meeting on the evening of the homicide, deceased drew his knife upon a stranger, and would have cut him had he not been prevented; also, that he slapped the naked knife against the cheek of another man, at the same time using threatening language, this ruling is assigned as error. Defendant was admitted not to have been present at the time the transactions offered in evidence took place, and defendant's counsel did not offer to show that these acts were brought to the knowledge of defendant. The counsel for the prosecution at the time stated that he did not object to their giving in evidence any declaration made by deceased against the defendant. We think there was no error in excluding these acts and quarrels of deceased with other parties having no relation to the defendant. With still less plausibility can it be urged that the acts of a similar character, which transpired some

10 days before, offered to be proved by other witnesses, were admissible.'' (*People* v. *Henderson,* 28 Cal., 470.)

"The prisoner offered to show that the deceased was a man of violence, of turbulent character, and bloodthirsty. The evidence was excluded, and, we think, properly. The deceased was unarmed when he was assaulted, and the prisoner approached him from behind, and, while the deceased was peacefully conversing with an acquaintance, shot him in the back, the ball entering his body 'a little to the left of the backbone, nearly at the lower edge of the shoulder blade,' giving him a mortal wound; and when he had fallen the prisoner shot him again, and a third time, each wound being in the opinion of the medical witness, mortal. &ast; &ast; &ast; Under such circumstances, the character of the deceased, as being peaceable or otherwise, is of no import. Bad as it may have been, the prisoner had no right to kill him on that account. The bad character of the deceased, when allowed to be proven, should tend, in some degree, in connection with the immediate circumstances under which the killing was done, to show that the prisoner had sufficient grounds, as a reasonable man, to fear that he was himself about to receive, at the hands of the deceased, some great bodily harm, and that he acted under the influence of that fear in killing him. There must be some fact transpiring at the time of the killing indicating the then immediate purpose of the deceased toward the prisoner to be hostile, or at least equivocal, in its character, and which may be illustrated by the known reputation of the deceased, if he had one, in the community as a man of violence," etc. (*People* v. *Edwards,* 41 Cal., 643 and 644.)

"It is contended by the appellant that the court below excluded evidence offered by him to the effect that he was told before the shooting that the deceased was a dangerous character, and that he had better beware of him, and that this was error. The defendant claimed, and introduced evidence tending to show, that in firing the shot which caused the death of deceased he acted in self-defence. In connection with the evidence as to what occurred at the time of the shooting, it would no doubt have been competent for the defendant to show that before the shooting he was informed that the deceased was a dangerous man." (*State* v. *Lull,* 48 Vt., 586.)

"Where a defendant claims to act in self-defense, any evidence tending to show that he acted as a reasonably prudent man would have acted under the circumstances is competent. (*People* v. *Iams,* 57 Cal., 119, 130; *People* v. *Westlake,* 62 Cal., 307.)

"In this case the evidence tended to show that the defendant was

attacked by the deceased, and in the encounter that followed shot and fatally wounded him. In judging whether the defendant acted with reasonable prudence and caution, and in the honest belief that he was put in imminent danger of death or great bodily injury, it was proper that the jury should know, if such were the fact, that he had been informed beforehand that the man that attacked him was a dangerous character, and so believed at the time, as such information and belief might reasonably influence the conduct of a prudent man under such circumstances. Such evidence does not rest upon the necessity of showing that the communication was brought home to the *deceased,* as counsel for respondent contend. The sole object of it is to show the state of mind of the defendant at the time of the shooting, and for this purpose it was proper, and should have been admitted.'' (*People* v. *Powell,* 87 Cal., 364 and 365.)

There is a later California case, decided in the year 1901, in which, as stated in the headnote, it is held:

''A charge on a murder trial that evidence of the character of deceased, tending to show that he was a violent, quarrelsome, and dangerous man, was not admitted as tending 'in any way' to justify his slaying by accused, was not improper when qualified by the rest of the instruction, to the effect that the evidence of bad character was to be considered only as a circumstance illustrating the facts of the homicide, and indicating the *aggressor* and the nature of the aggression.'' (*People* v. *Young,* 63 Pac. Rep., 837.)

In applying the law found in the California cases to the facts of this case under consideration lay the error into which the trial court has fallen. No one denies the legal principles invoked, but what application have they to a state of facts differing in essential particulars from those under consideration by the court enunciating the opinions in which those principles are expressed?

In regard to the character and reputation of the deceased in trials for homicide a careful review of all the leading decisions of the American courts results in the establishment of the following general principles:

No man is excusable for killing another merely because his victim may be of a violent, turbulent, or bloodthirsty dis-

position; and as a general rule evidence concerning the character of the person killed, whether it is good or bad, is not admissible in a prosecution of the slayer for the homicide. (*State* v. *Chandler,* 5 La. Ann., 489, 52 Am. Dec., 599; *Hudson* v. *State,* 6 Tex. App., 565, 32 Am. Rep., 593.)

However, when it is shown that the deceased is a person of a violent, dangerous, or bloodthirsty character, a defendant who has been assaulted or menaced certainly may have had more reason to fear that he was in danger of death or serious physical injury than he would have been had the assault been made by a man of a peaceable and quiet demeanor, and the party assaulted or menaced had the right to take more prompt, forcible, and effectual means for self-protection than he might otherwise have been warranted in doing. Therefore, in cases where the slayer seeks to justify the killing on the ground of self-defense, evidence of the violent, turbulent, and dangerous character of the deceased is admissible as tending to show that the defendant was justified in believing himself to have been in danger of losing his life or of suffering serious bodily harm, and as tending to explain the actions of the deceased at the time of the killing, and because this bears upon the motive prompting the homicide. All that is required to render such evidence admissible, on these grounds, is that the testimony given in the case tends to show that the deceased was the aggressor, and it is sufficient that the element of self-defense appears in the evidence, though it is shown solely by the testimony of the defendant himself. (*State* v. *Feely,* 3 L. R. A., N. S., 351; *Storey* v. *State,* 71 Ala., 329; *Kapp* v. *State,* 100 Ala., 4; 46 Am. St. Rep., 17; *State* v. *Morey,* 25 Or., 241; 35 Pac., 635; 36 Pac., 573.)

Still it is necessary, in such cases, that there should have been a hostile demonstration by the slain towards the slayer, which, when considered in connection with the character of the deceased, might have awakened, in the mind of the defendant, a belief in the imminent peril to his life or limb;

the consideration of the character of the deceased being restricted to the determination of the meaning, or apparent meaning, of the overt act or demonstration made by him; though the act or demonstration may have been one which would have ordinarily been regarded as innocent had it not been for such a character on the part of the actor; and proof of such a hostile act or demonstration must first be made in order to lay a predicate for the introduction of evidence showing the violent, turbulent, dangerous, or bloodthirsty character appertaining to the party slain. (*Powell* v. *State,* 101 Ga., 9; 65 Am. St. Rep., 277; *Garner* v. *State,* 28 Fla., 113, 29 Am. St. Rep., 232; *Morrell* v. *State,* 136 Ala., 44, 34 So., 208.)

But surely the character of the deceased, however bad it may have been, could not have had any effect on the belief in the mind of the defendant that he was in danger of death or great bodily injury unless he knew what that character was. Proof, then, of such previous knowledge on the part of the accused is necessary to the admissibility of such evidence of character, and like the evidence of a hostile act or demonstration, heretofore alluded to, it must be produced as a foundation for the evidence offered of the bad character of the person slain. (*Henderson* v. *State,* 12 Tex., 525; *Com.* v. *Straesser,* 153 Pa., 452, 26 Atl., 17; *Dukes* v. *State,* 11 Ind., 557, 71 Am. Dec., 370.)

Nor does the law of self-defense apply so as to warrant the court in considering the dangerous, violent, and bloodthirsty character of the deceased when, though the killing was done to save the life of the accused, in cases where the altercation in which it became necessary was provoked by the slayer; and in such a case evidence of the bad character of the slain person is not competent; although it may possibly be proper, after the guilt of the defendant is established, to consider such evidence in measuring the punishment which should be meted out to the slayer. (*Teague* v. *State,* 120 Ala., 309; 25 So., 209; *Coile* v. *People,* 240 Ill.,

494, 93 Am. St. Rep., 208; *Morrison* v. *Coni,* 24 Ky. L. Rep., 2493, 67 L. R. A., 529.)

So it is that, in a general way, it may be said that in cases of homicide the bad character of the person slain is admissible only on the issue of self-defense. It has been directly and repeatedly held that such evidence is also admissible when there exists any doubt as to the nature of the homicidal act, or as to which party was the aggressor; though perhaps the real meaning of this rule is that such evidence is admissible whenever it appears to be uncertain whether or not the act of killing was done in self-defense. (Note to *State* v. *Feely,* 3 L. R. A., N. S., p. 377.)

And the courts of some of the States have held that such evidence is admissible for the purpose of grading the homicide and fixing the punishment. But in others that the evidence of character for such a purpose is admissible has been denied; yet the weight of authority seems to be in favor of its admissibility. (*Fields* v. *State,* 47 Ala., 603, 11 Am. Rep., 771; *Smith* v. *State,* 88 Ala., 73, 7 So., 52.)

The kind of character or reputation, on the part of the deceased, which it is admissible to prove in cases of homicide, must be such as to explain the conduct of the deceased at the time of the killing, or to give meaning or significance to such conduct, or it must tend to illustrate the circumstances attending the tragedy. Other and different traits of character cannot be shown; though special traits of character, under special circumstances, when such special circumstances are proved to have existed at the time of the killing, may be put in evidence. (Note to *State* v. *Feely,* 3 L. R. A., N. S., p. 377.)

Character must ordinarily be proved by general reputation and not by specific acts or the opinion of witnesses. Specific acts of bad character, on the part of the deceased, however, may be proved when they are known to the slayer; since knowing them he must have taken them into consideration in deciding as to the necessity of slaying his adversary in order to protect himself. (*Heffington* v. *State,* 41 Tex.

Crim. Rep., 315; *Harrison* v. *Com.,* 79 Va., 374, 52 Am. Rep., 635.)

Persons who have known the deceased for a long time are competent witnesses to prove his character, and the admissibility of evidence as to character is a question of law to be decided by the judge; but its weight and effect is a question of fact which falls within the province of the jury. (*Garner* v. *State,* 28 Fla., 113, 29 Ann. St. Rep., 232; *State* v. *Christian,* 44 La. Ann., 950, 11 So., 589.)

It is clear to my mind that the reason given by the district judge was not sufficient to warrant the exclusion of the evidence offered to prove the bad character of the deceased, since it is entirely possible that although the defendant may never have seen the deceased prior to the fatal encounter he may have known who he was, by knowing the cabin in which he lived or from other circumstances, and he may have been well informed as to the character borne by the tenant of that particular cottage, which was under his charge as agent, though not perfectly cognizant of his personal appearance. Then the question was not, as seems to have been the idea of the trial judge, was the accused acquainted with the deceased, but did he know the character which he bore as a violent, a turbulent, or a dangerous man. From the viewpoint of the trial judge on this question, the California cases cited by him do not sustain his ruling; and there are no other authorities which will do so, as it is clearly incorrect as a legal proposition.

The distinguished counsel, who filed a written brief in this case for the appellant, makes use of an English translation of the stenographer's notes, taken on the trial, and filed the same as an appendix to his brief. Such notes form no part of the record on appeal, and a reference to them, as a statement of facts, only tends to make the brief confused and difficult to understand, and greatly impairs its usefulness to the court as an aid in the consideration of the case. The facts must be taken from the statement regularly pre-

pared, signed, and certified by the trial judge; and if any
part of the stenographic notes is omitted, in the statement
of the case, it is presumed that such part was either incor-
rect or unimportant. We cannot go behind the certificate of
the district judge as to what were the facts proven on the
trial, unless in cases where a bill of exceptions is taken to
the omission and properly supported by appropriate affi-
davits.

But, though the trial judge may have given a wrong rea-
son for it, his ruling may still be correct in excluding the
evidence offered as to the character of the deceased. Let
us see. Would the certificate of the warden of the peniten-
tiary have been admissible on any grounds? No case is cited
sustaining the admissibility of such a document in proof of
bad character, nor have we been able to find any such case.
Specific acts of the deceased are not admissible in proof of
his character unless it is first shown that the accused was
cognizant of such acts. Such a certificate is on no better
footing than specific acts; and it is not shown, nor was it
offered to be proven, that the accused knew the prison record
of the deceased before the commencement of the fatal affray.
Then, without such a predicate, the document was not admis-
sible in evidence and there was no material error in the ruling
of the court below in its exclusion.

We have often held, in accordance with ample authority,
that an erroneous reason given by a trial judge for a ruling
essentially correct does not vitiate the judgment and will
afford no excuse for a reversal.

Having disposed of the preliminary question, I will now
take up the principal matters involved in the decision of this
case and the review of the judgment of conviction rendered
in the court below.

More than eight years ago the Legislature of Porto Rico,
in furtherance of justice, passed an act of which the follow-
ing is a copy of the principal section, to wit:

"Section 1.—That the Supreme Court of Porto Rico shall hereafter be a court of appeals and not a court of cassation. In its deliberations and decisions, in all cases, civil or criminal, said court shall not be confined to the errors in procedure or of law only, as they are pointed out, alleged, or saved by the respective parties to the suit, or as set forth in their briefs and exceptions, but in furtherance of justice, the court may also take cognizance of all the facts and proceedings in the case as they appear in the record, and likewise consider the merits thereof, so as to promote justice and right, and to prevent injustice and delay." (Sess. Acts of Porto Rico, 1903, p. 59.)

This act clearly gives the Supreme Court the right to review the facts in every case tried below, whether civil or criminal; moreover, it is the duty of this court so to do. And unless satisfied that justice has been attained in the trial court, no judgment ought to be allowed to stand unreversed. I fear that we may, perhaps, now and then, in the multitude of official matters pressing on our attention, pass over lightly the duties which this statute requires at our hands. But, speaking for myself alone, I will say that I shall never knowingly affirm any judgment in which the least injustice has been done to any party; much less allow any man to be deprived of his liberty, or his life, by an error of law or of fact, if within my power to prevent it. Believing it to be my duty to carefully analyze both the law and the facts of this case, I shall approach that duty with the best energy and mental force at my command.

Inasmuch as the judge who tried this case in the court below is now a member of our Supreme Court, a natural hesitation may be felt in adversely criticizing his rulings and opinions; but such considerations should be put aside when they obstruct the path of duty, as they do here and now. So, with the greatest respect for my colleague, I proceed.

As it is an important issue in this case let us examine, at least briefly, the American law relating to the question of self-defense. Wharton says it is permitted by the law, to a party on whom a grave wrong is attempted, to resist such a

wrong, even at the peril of the life of the assailant. Self-defense is often characterized as a God-given right, because it originates in the law of nature and is thus independent of human laws. But its exercise must necessarily be regulated by the codes adopted for the government of men living to- gether in a state of society and more or less dependent on each other. We must, therefore, look to the statutes and the decisions of the courts on cases arising under them in deter- mining the application of the principles of self-defense to any given state of facts.

In the decision of this case it is important to determine whether or not the trial court took a correct view of the doc- trine of self-defense, in the admission and exclusion of evi- dence, and in the appreciation of the proof or in weighing the evidence when admitted. Where the evidence is conflict- ing this court has often refused to review the decision of the trial court or the jury in regard to the credibility of witnesses and the weight to be given to their testimony, unless under special circumstances. But the application of legal rules and the consideration of admitted facts and the relation of the law to the evidence, in any particular case, do not fall within this principle, and these matters have always been considered as properly reviewable by the appellate court. It is a ques- tion of law for the trial court to decide in the first instance as to what facts excuse or justify a homicide. What consti- tutes a lawful or an unlawful killing of a human being is a question of technical and legal learning, which, when a case is brought before a jury, should be defined by the court, in its instructions, and is not a question of fact to be left to the jury for their decision. (*Harbour* v. *State*, 140 Ala., 103, 37 So. Rep., 330; *Gladden* v. *State*, 12 Fla., 562.)

It should be remembered that it is the province of the court to state what are the rules of law, and for the jury to de- termine whether facts excusing or justifying the homicide existed in the particular case under consideration. (*Pinder* v. *State,* 27 Fla., 370, 26 Am. St. Rep., 75; 8 So. Rep., 837.)

It is strictly within the province of the trial court to determine whether the evidence was sufficient to establish a legal justification on the ground of self-defense, and, when the case is tried before a jury, the determination of the court on this point should be stated in its charge. (*Franklin* v. *State*, Tex. Crim. App., 88 S. W., 357; *State* v. *O'Neil*, 58 Minn., 478, 59 N. W., 1101.) It has been held that although evidence as to self-defense in a prosecution for homicide appears in the record, this will not warrant an appellate court in disturbing the verdict of a jury finding the defendant guilty of manslaughter, unless it clearly appears therefrom that the conviction was against all the evidence. (*People* v. *Boling,* 83 Cal., 380, 23 Pac. Rep., 421.) Where an issue as to self-defense arises on the trial, it is the right of the accused to have the law upon that subject correctly and fully explained by the court to the jury in all the phases in which it might be applicable to the facts in evidence. (*King* v. *State,* 13 Tex. App., 277; *Bell* v. *State,* 17 Tex. App., 538.)

And where the facts in evidence authorize the court to charge the jury on provoking an altercation, the court should indicate from the evidence what is the act of provocation, and should define its effects and hearing upon the case at bar, and state to what extent such act would limit or abridge the right of self-defense, not leaving the jury to conjecture as to the nature and quality of the act, or as to the extent of the limitation and abridgment which such an act would place upon the rights of the accused. (*Morgan* v. *State,* 34 Tex. Crim. Rep., 222, 29 S. W. Rep., 1092; *Johnson* v. *State,* 141 Ala., 37, 37 So. Rep., 456.) If an inference of self-defense may be reasonably drawn from the facts by the jury, it is erroneous to charge them that if they believe the evidence of the accused he would at least be guilty of manslaughter, such a charge excluding any idea of self-defense. (*State* v. *Hough,* 138 N. C., 663, 50 S. E. Rep., 709.) In a prosecution for homicide the question as to whether or not it was justifiable or excusable on the ground of self-defense must be left to the jury, and

when the evidence in regard thereto is conflicting, its weight and credibility are questions which the jury must decide. (*Kipley* v. *People,* 215 Ill., 358, 74 N. E. Rep., 379; *Martin* v. *State,* 17 Ohio C. C., 406; *State* v. *Turner,* 29 S. C., 34, 13 Am. St. Rep., 706, 6 S. E. Rep., 891; *People* v. *Grimes,* 132 Cal., 30, 64 Pac., 101; *North* v. *People,* 139 Ill., 81, 28 N. E. Rep., 966; *Pridgen* v. *State,* 31 Tex., 421.)

Where the evidence has a tendency to show that the killing was committed in self-defense, its weight is for the determination of the jury, however slight that tendency might be, and it cannot be excluded from them. (*Armswrothy* v. *State,* Tex. Crim. App., 88 S. W. Rep., 215; *Morris* v. *State,* Ala., 39, So. Rep., 608.) Instructions as to self-defense should be given to the jury whenever there is any evidence whatever as to self-defense. (*Territory* v. *Watson,* N. M., 78 Pac. Rep., 504.) And all the surrounding facts and circumstances should be taken into consideration by the jury in determining whether the killing was in self-defense or otherwise. (*Sullivan* v. *State,* Miss., 32, So. Rep., 2; *Bird* v. *United States,* 187 U. S., 118.)

In like manner, the jury are the sole judges as to the degree of force a person assaulted may use to prevent violence and injury to himself. (*Coleman* v. *State,* Tex. Crim. App., 90, S. W. Rep., 499; *Hulse* v. *Tollman,* 49 Ill. App., 490; *State* v. *Stockton,* 61 Mo., 382.) And it is a question for the jury to determine whether or not from the evidence the defendant had, apparent to his comprehension as a reasonable man, the means at hand to avoid killing the deceased without incurring imminent danger of losing his own life or of suffering great bodily harm. (*People* v. *Gonzále?,* 71 Cal., 579, 12 Pac. Rep., 783.)

But it is for the jury alone to determine the question of guilt or justification, as a whole, taking into consideration all the circumstances surrounding the case; and a charge of the trial court singling out a particular act of the deceased and instructing the jury that such act cannot be invoked in con-

sidering the question of self-defense is an invasion of their province and is necessarily erroneous. (*Eiland* v. *State,* 52 Ala., 322.) It is for the jury to determine whether the acts of the accused during the fatal affray were of such a character as to provoke an altercation and whether they did so provoke one, and this must be determined from all the evidence. (*Logsdon* v. *Com.,* 19 Ky. L. Rep., 413, 40 S. W. Rep., 775; *Baldwin* v. *State,* 111 Ala., 11, 20 So. Rep., 528; *State* v. *Hatch,* 57 Kan., 420, 57 Am. St. Rep., 337, 46 Pac. Rep., 708.) And in all cases where an issue arises as to which party provoked the altercation, the court should lay before the jury the circumstances indicated by the evidence raising such issue. (*Mozee* v. *State,* Tex. Crim. App., 51, S. W. Rep., 250.)

And where a conflict of evidence is developed it rests solely with the jury to determine which line of testimony they will believe, and the court, no matter what may be the disparity in numbers or what may be the character of the opposing witnesses, is not entrusted with the duty of deciding such a controverted issue of facts. (*Eby* v. *State,* Ind., 74, N. E. Rep., 890; *Gibson* v. *State,* 91 Ala., 64, 9 So. Rep., 171.) Nor should the court assume, where there is a question as to which party was in the wrong, that one party or the other was first or chiefly in fault. (See Hatch and Gibson cases cited above.) So it is a question for the jury to decide from the facts in evidence whether the homicide was a cold-blooded murder, a case of mutual combat, or one of self-defense. (*Koller* v. *State,* 36 Tex. Crim. Rep., 496, 38 S. W. Rep., 44; *Hellard* v. *Com.,* 27 Ky. L. Rep., 115, 84 S. W. Rep., 329.) It is also a question for the jury to determine whether the circumstances of the altercation in which the killing occurred were such as to justify the plea of self-defense when considered alone without reference to previous occurrences. (*Bolzer* v. *People,* 129 Ill., 112, 4 L. R. A., 579.)

In reviewing a case tried by the judge alone without a jury we must carefully distinguish between matters cognizable by him, sitting as a judge, and facts falling under his con-

sideration while performing the duty ordinarily incumbent on
the jury. All questions decided by the judge as such, being
questions of law, are clearly reviewable by the appellate
court; but when the trial judge is performing the functions
of a jury in weighing and reconciling the conflicting state-
ments of witnesses in doubtful cases the appellate court some-
times declines to intervene, except when the decision appears
to have been influenced by partiality, passion, or prejudice or
to have arisen from a manifest error or to have caused a mis-
carriage of justice. In such cases as the latter the appellate
court will not hesitate to interpose in behalf of justice and to
rectify any wrong which may have been done.

Let us then examine the appreciation of the proof, as it
is called in Porto Rico, or the weight given by the judge to
the evidence. The trial judge does not seem to have given
any consideration whatever to the fact, which is undisputed,
that Rosa was a taller, stronger man than Sutton, and was a
dangerous adversary even when unarmed. He also made up
his mind that the wound or scratches, five in number, found
on the body of Sutton were caused by the barbed-wire fence
through which he is supposed to have crawled in retreating
from the field of combat. He bases this opinion on the tes-
timony of María Rodríguez and on an inspection of the clothes
themselves. We have been unable to inspect the clothes, and
the testimony of María Rodríguez is unsatisfactory. She
fixes the date of the incident in May instead of March. Per-
haps Sutton did pass her home in May, as she stated, and go
under the wire by bending down his head. No other witness,
although there were no less than five present, corroborates
María Rodríguez, nor did any of them see Sutton pass under
the wire. There was no occasion for Sutton to cross a fence
of any kind in retreating from the scene of the combat to his
own house, as the streets were open and no one pursued him.
If Dr. Fosas told the truth, and he is a man of intelligence
and presumed to be an honest witness, all the scratches on
Sutton's body could not have been caused by the barbs on the

fence wire. He testifies that the wounds on the limbs could not have been so made. If they were not so caused then Rosa must have been armed and inflicted them with a weapon. And what is more reasonable than that he should have had a *machete?* Does not every farmer in this Island always carry one? Sutton says he saw one in his hands. And would a man go out to plant *yautias* and dig *yucas* (roots like potatoes) without some sort of an implement? To say that he was grabbing them with his hands is incredible. Then the negative testimony of the friends and relatives of the deceased that they *did not see* any weapon should not outweigh the positive evidence of Sutton, corroborated by the wounds found on his body by the surgeon who testified. The defendant states that deceased was armed.

In order to thoroughly understand the facts of this case we will quote in its full extent the evidence given by the several witnesses, as set forth in the

### STATEMENT OF THE CASE.

On December 11, 1908, the hearing of this case took place, the *fiscal* and the accused, with his attorney, appearing and representing the respective parties. The *fiscal* presented in evidence a certificate of the death of José Rosa, issued by the Registrar of the Civil Registry of Bayamón, which document the court admitted, with the previous consent of the accused.

Then the *fiscal* presented his oral proof, calling various witnesses, as follows:

1. Flora Rosa testified that she lives in the country place known as "Vista Alegre" at Bayamón; she has her husband and son, and is a sister to José Rosa, who died on account of being shot by the accused, which occurrence was as follows: The brother of the witness, José Rosa, on arriving from the street, sent her to gather some *gandules* (beans) while he went to get some *yucas* (a kind of root), and while he was taking them out the American came and spoke to him, and right then, at that same moment, the witness heard the shot

and ran over where her brother was, who was already dead, and the American left with the revolver in his hand. There was also there the eldest daughter of the deceased and the witness saw the old man Bartolo, and there was no one else. Her brother fell with his face towards the ground; he did not say a word, and died right there.

The witness, being questioned by the attorney of the accused, says that her brother was pulling out the *yuca* with his hands because the ground was sandy and he did not have a knife. She did not see the American approaching until he was speaking to her brother, and they were speaking neither low nor loud; the witness was about 35 yards distant; she could hear the sound of their voices but not the words. When the witness heard the shot she looked where her brother was and saw him fall, and the American ran away; there were the witness, the daughter of the deceased, and no one else, present at the time.

The witness, being asked by the judge, says that the plants from which the *gandules* were being taken were quite large and she was not able to see her brother very well, these plants being between her and the place where her brother was. He was only taking those *yucas*. She did not notice the American approaching until he was speaking to the American, and she continued picking the *gandules,* and it did not take very long before the shot was heard. And right away her brother fell to the ground with his face looking downwards; and the witness arrived, not having in her hands anything else, or even around her, but the *yucas.* The American to whom she refers is the accused.

2. Juana Rivera testified that she is the mother of the wife of José Rosa, in whose house the witness was assisting her daughter, who was about to give birth to a child. José Rosa lived on the estate of Mr. Sutton, on a piece of land rented by him, and in a little house that was there all of them lived. The day of the event José Rosa was planting some *yautías* (a kind of root) and afterwards he went to pull up some *yuca*

to give breakfast to the family; and the accused arrived and stepped forward and slapped José Rosa, who put his hands around his (the American's) waist, and then the American shot him and killed him. He died instantly, and the American left with the revolver in his hand. José Rosa went forward to the American, threatening him, and then the American shot him.

She, being asked by the attorney, says that she was at the house of José Rosa and in the kitchen, and through a hole in the kitchen, which is made out of *yagua,* saw the American, who was speaking with José; and the witness came out and saw her son-in-law falling and the American running away. And the witness screamed and the people ran over. The sister of José and a little girl were further down from the house, and also there was another little girl, being both of them with their aunt, Flora Rosa, who ran over when they heard the shot. José Rosa and the accused only had a few words, and there was not any struggle between them. José Rosa was pulling up the *yucas* with his hands, and to work he used a spade which he left near the *yautías.*

To questions asked by the judge, she says that the kitchen is closed up by old *yaguas* and only had the door to enter, but without shutters (*yaguas*), and the witness was there when the accused spoke to José Rosa; and on hearing the voice of the American the witness came out to the (*batey*) dooryard, and they spoke two words which were not heard by the witness; and when the American spoke, José Rosa straightened up and the American gave him a slap; then José put his hands around the waist of the American and he shot him. José ran forward and fell down to the ground. From the place where Flora and the little girls were picking *gandules* they could not see José Rosa, because he was away behind.

3. Bartolo Arroyo testifies that he lives on the same estate; and on March 11, 1908, arrived at home about 3 o'clock in the afternoon. His home is about 20 yards from the house of José Rosa, and when the witness passed by the house he

(Rosa) was with a little girl pulling out a *yuca* plant; and the witness, on arriving home, heard José Rosa speaking, and the witness looked out of the window of the house and saw Mr. Sutton arrive and in a low tone of voice he (Sutton) said something to José Rosa. And when he met him the American gave him a punch. He jumped back and the American put his hand inside of his shirt. José jumped to catch him and the witness ran over and, on arriving near them, the shot was fired and Rosa fell down between two stakes. Rosa was the one that jumped to grab the American; the American ran away with revolver in hand after the shot.

(He examines the revolver which is shown to him by the *fiscal* and says that it is something like the one the accused had.)

Being asked by the attorney, he says that José Rosa, who was on all-fours, grabbed the accused in order to prevent him from taking out the revolver. The American had one hand outside and the other inside of his shirt, where he had the revolver; both of them were on their all-fours and José Rosa with his two hands had the American caught by the arms. José Rosa was pulling out some *yucas* with his hands; he had no weapons, and around him there were not knives or anything else. There was Flora Rosa and a little girl, daughter of the deceased, and Juana Rivera at the kitchen stove making a broth, which is known by the witness because she screamed.

(The witness reproduces graphically *before the jury* his statement, explaining the way in which the events occurred, taking the accused and grappling with him in the same manner in which he saw him with José Rosa.)

4. José González testified that he lived, on March 11, 1908, on the same place as José Rosa, which is an estate managed by Mr. Sutton. He was just around it and saw when the American met José Rosa, grabbing each other, José going toward his home and the other in the opposite direction. While in the struggle the American pulled out his revolver

and shot José, who fell dead, the American running away toward his home. The estate is divided by a street and at the mouth of same there is a wire, and on the other side there is another. He did not notice whether José had any knife or not.

Being asked by the attorney, he says that the accused had the revolver inside of the waistband of his pants and took it out and shot.

5. Dr. Manuel Fosas practices his profession at Bayamón and, on the 11th of March last, made the autopsy on José Rosa, who died from the hemorrhage of a bullet wound that passed through his heart and the lungs, his death having occurred instantly.

On finishing the proof of the *fiscal,* the proof of the defense was introduced.

1. Dr. Manuel Fosas continued, testifying as a witness for the defense, and says that on that day, referred to by the *fiscal,* he saw the accused about 5 o'clock in the afternoon, observing several wounds he had, which were superficial, such as scratches made by an instrument somewhat dull; some wounds were filled with dirt, and witness believes that the accused got said dirt when he fell to the ground after he had been wounded, or because the weapon with which he was wounded was full of dirt. In two or three wounds the witness observed that there was dirt inside of them; they could have been made with an instrument very dull, as a dull knife. The wounds correspond to the clothes that the accused had on.

Replying to the attorney, witness says that those clothes were the ones the accused had on the day of the event, and on the shirt there is a hole as if it was a bullet hole, and a burn which corresponds to the hole. The accused had five wounds, some on the side and on the legs and others on the back, corresponding with those of the clothes.

On being asked by the *fiscal,* he says that such wounds on the back could have been made by wire-fence barbs, but

not the ones on the legs; that the cuts on the shirt could have been made by the wire fence, and also could have been made during a struggle with another party.

On being asked again by the accused, through his attorney, witness says that the wounds on the back could have been made by the wire fence or by a dull knife.

Being asked by the judge, he says that he recognized the accused in town about 5 o'clock in the afternoon, the estate being about 10 minutes' walk from there; the wounds were superficial and irregular, had lacerations, and could have been made with a knife or weapon somewhat dull, which also cut the clothes, but with force. Said wounds could have been made with a knife not sharpened, but to cut up the cloth of the garment there would have to be a man quite strong. That the cut which there is on the right leg of the trousers could be made either with a sharp knife, with a cutlass, a short sword, a saber, or a table knife, and the weapon would have had to be thrust in different directions.

2. D. A. Skinner testified that he is sub-Secretary of Porto Rico; that he knows the accused, has known him since 1901, as a man of good conduct, not having taken any part in any fights or quarrels; has a good opinion about the morality of the accused, who takes care of his work.

On being asked by the *fiscal,* he says that he knew the accused for the first time at Ponce, and is a friend of his, and thinks him to be a gentleman.

3. Ezequiel Mongil testified that he is chief of police at Bayamón. On March last, on the trial day, the witness was in his office, and a negro came in saying that the godfather of his son, José, had been killed. He went over to the place, together with the judge, and found José Rosa on the ground and Mr. Sutton away from him; the latter had been arrested by the police, who took from him his revolver. There was quite a big crowd commenting on the event. The witness ordered that the accused be brought to the town and the deceased sent to the cemetery, and when they arrived at the

town Dr. Fosas passed over—that is, to the police headquarters. The witness called him and he came in and inspected the accused, for which purpose he made him take off his clothes. The witness saw that the accused had several scratches.

(On being asked by the *fiscal,* he does not remember how the accused was dressed, but he was in his working clothes, full of dirt, and his hands were dirty.)

4. Césaro Fernández testified that he knows the accused and knew José Rosa, and saw them on the day of the controversy. The witness was cleaning up the estate or farm, and the accused passed back of him and saluted him while he was busy cleaning up the sugar-cane. He heard a noise and saw some colored people, who were three, fighting against the accused. At first the witness did not know who it was, because he was hidden in the middle. In the meanwhile they pushed him and one of his legs was shown, and by the pants the witness knew who the accused was. And he heard a shot and the one that had the accused grabbed let him loose and walked away, falling to the ground. And the rest of the people ran away. Then the accused also ran away with his shirt torn up and his clothes hanging down.

On being asked by the *fiscal,* he says that he was quite distant from the place of the event, and between the witness and that place there were several feet of planted sugar-cane which were ready to be ground, and over the sugar-canes the witness could see. The sugar-canes and the fighting parties were on level ground, and there were quite a large number of canes and they belonged to the witness, who had bought them from a lady. There were some houses there, and one belonged to José Rosa and another to Bartolo Arroyo; the first being a little distant from the group where the event occurred and the second nearer. José Rosa was the one that had the accused grabbed and the rest were grouped together, Bartolo being one of them. The witness did not know the

rest of them, because it is only a short time that he had lived
there.

On being asked by the *fiscal,* he says that Arroyo was
not in the struggle with the accused, but they were all to-
gether; that he cut the sugar-cane a month afterwards;
that he saw the event over the sugar-cane and knew the ac-
cused by a yellow pair of pants, for he had passed beside
the witness.

5. Jesús Pérez Martínez testified that he knew Rosa and
knows the accused; the first had a piece of land and a little
house on the real estate or farm of the name "Quinto,"
managed by the accused. There were plantations made by
José Rosa, but outside of the land he had rented, and they
did not belong to him, which fact is known by the witness
because he was the collector of the estate. He knew about
the event half an hour after it occurred. He saw the place
where Rosa fell and it was outside of the land that belonged
to him. He knows the place in which Rosa used to take out
the *yucas* before the event happened; that was also outside
of the place he had rented.

On being asked by the *fiscal,* he says that Rosa used to
pay his rent punctually; he does not know to whom the *yucas*
belonged; there were large trees of *gandules* at that place.

6. José Eraso testified that he was cutting sugar-cane
on the estate when the event took place, which he did not see;
and Mr. Sutton, under whom the witness worked, sent him
for the police about 3 o'clock in the afternoon, saying that
he was wounded.

On being asked by the *fiscal,* he says that the accused was
near his house and he did not notice how he was dressed,
because the accused had ordered him to go for the police
because he was wounded, and he went over to get them.

On being asked by the judge, he says that the police came
over with the lieutenant.

7. George Sutton says that on the day of the event he
was going around the estate, and on passing near where José

Rosa lived saw him working on the ground, and saw two other fellows talking, of whom he asked, "Who is planting?" One of them answered, "I." On witness asking his name he answered, "José Rosa"; he asked him where he lived; he answered, "I live here," pointing out a little house which was a few yards away from there; he asked him when he was going to pay the rent of the land he occupied, and he answered that he did not owe anything. The witness replied that he owed for a *cuerda* since August, and he answered that he was not going to pay a cent. The witness told him that he had to give up planting; that it was the first time that he met him, but that he had left several messages at the house. José Rosa told him that it was a lie, because he had not left any messages at the house. The witness then insisted that he had left such messages, and that he (Rosa) knew that all the parties that were planting had to pay 50 cents for each *cuerda*. Rosa answered him, "*Carajo,* it is a lie," and at the same time stepped forward, knocking him with his hand. The witness defended himself and felt a punch on his right hand and saw some blood. He continued fighting with Rosa in order to catch his hand, and when he felt a knock made by a fist on his head the witness put his hand inside of his shirt in order to get out his revolver, and the third party grabbed him by the waist, catching his right arm in such a way that he could not get out his revolver. He continued grabbed by José Rosa, who was giving him knocks, and in this way the four of them continued clinched to each other. The witness felt a cut on his feet, and on lifting the barrel of the pistol shot it off underneath the shirt, because, as stated, his arm was held by the other fellow, by the name of José González, and a shot was fired. Right there they all let him go free. José Rosa walked about 15 or 20 feet towards his house and fell with his mouth toward the ground. Then the witness ran over to his house and called the servant, José Eraso, so that he would go for the police, because he (witness) was wounded. When the revolver shot off he had it on the left

side and so he shot it off, and he was grabbed by two fellows without his being able to tell whether José Rosa had him grabbed, also because the witness had him grabbed. He saw in the hand of José Rosa a piece of a *machete*, and Rosa was taller and stronger than the witness. He delivered the pistol to the police. The wounds and scratches which the witness had on his body were caused by the struggle with José Rosa. After the event the witness did not go under any wire fence, and on that account he can assure any one that the scratches were not made by the wire fence or from any other body, but were made by Rosa.

On being asked by the *fiscal*, he says he came out to the road by the place called the "Cachete," that has one side fenced. The witness was inside of the estate and through it came out by a street called "Cachete" to the road; he did not go under the wire fence; he knows María Rodríguez, who lives at Comerío Street, near the place, and then she lived inside of the "Cachete".

To the questions of the judge, he says that the fence is made of wire barbs and of *malla* (a plant like pineapples).

In this way the proof of the defense was finished, and then the *fiscal* proposed evidence in rebuttal, which was admitted.

1. María Rodríguez testified that on the 11th day of March last she lived at "Cachete," and there were several neighbors, among them José Rosa, who lived further out; and on that day she saw the accused around the *corral* of the house with a revolver in his hand by the wire fence, bending down his head; that there are three wires with barbs, two of them are down on the ground, and another in good shape and high up; that the accused in passing had his clothes torn on the back, without seeing if it was by the back, leaving the torn piece of cloth at the wire fence.

To questions propounded by the attorney she says that she made it possible so that the *fiscal* would know it, because the detectives asked the witness if she had seen something, and

she answered that she had seen Mr. Sutton passing through the wire fence with the revolver in his hand; that when she was asked by the detectives about it Mr. Sutton was not there; and she cannot tell the date the witness saw the accused pass, but they say that it was on May 11, and she sustains on that same day, May 11, was when she saw Mr. Sutton passing by the *corral* of her house.

In reply to questions from the judge, she says that they told the witness that Mr. Sutton had killed Rosa on that same day when she saw him pass through the wire fence.

The foregoing is a true statement of the case in full and, of course, must be considered by us as having embodied in it all the material facts. As it was approved by the trial judge we must regard it as authentic. If it is to be considered as erroneous, any errors which counsel might suppose to have been made could have been pointed out by a bill of exceptions, properly signed; and if the trial judge should refuse to sign such a bill the counsel could have procured the signatures of bystanders, supported by affidavits; such is the proper practice in such cases.

Taking all the facts and circumstances shown by the record into careful consideration, can this court say that this defendant has had a fair and impartial trial? What would have been the decision of an American judge in the States of Tennessee, Kentucky, Illinois, or Alabama, or anywhere on the Continent in such a case? What would have been the verdict of a Porto Rican jury on the facts as presented to us in this record? Is a man, when assailed, on his own land and in danger, at least, of a severe beating, not to have the right to repel force with force and to protect himself from harm by all necessary means?

Let us in this connection consider, fairly and impartially, the tale told by the defendant himself on the witness stand. He may be entitled to perfect credence, though he was the defendant and on trial for his liberty before a court in which the proceedings were conducted in a language foreign to him.

While he was the defendant it must be borne in mind that most of the prosecuting witnesses were the relatives and friends of the deceased, all of them members of his race and nation. Bias or prejudice on the part of the witnesses for the one side or the other, or both, may have existed, perhaps in different degrees. Then let us examine the evidence somewhat in detail.

In order more effectually to analyze the facts of the case we may properly review and make a compendium of the material portions of the evidence.

*A few of the facts are undisputed.* These are the following:

José Rosa is dead. He was killed on March 11, 1908, in Bayamón, by a pistol shot fired by George Sutton. The pistol at the time of the shot was held by the defendant in his hand, beneath his shirt, and the bullet penetrated the shirt of the accused, powder-burning it, and went into the body of the deceased and through the heart and lungs. The death of Rosa took place almost instantly, after he had walked about 15 or 20 feet. The two men had never met before that morning, and Rosa was unknown to Sutton by name. Rosa lived in a cabin on the estate called the "Quinto," of which Sutton had charge as agent. The parties had some conversation in regard to the rent in an ordinary tone of voice. An altercation ensued in which the parties clinched and the arms of defendant were clasped by some one in such a manner that he could not draw his pistol entirely out, and on that account he fired it while it was still within his shirt. After the shot was fired Rosa walked toward his house and fell, face downwards, to the ground, and at once expired. The slayer ran, with the pistol in his hand, to his own house, and called his servant, José Eraso, and sent him for the police. When they arrived he surrendered to the police and gave them his pistol. The deceased was taller and stronger than the accused.

When Sutton arrived on the ground Rosa was gathering

*yucas*. Sutton had his revolver inside his shirt. At the time the shot was fired both the slayer and the slain were clasped together on their all-fours. There was a struggle between them. When examined Sutton had five scratches on his body and as many rents in his clothes corresponding therewith.

The place where the killing took place was not on the land rented by Rosa. The *yucas* were not on the land for which Rosa had paid rent. It does not appear to whom the *yucas* belonged. The *gandules* (beans) grew on large bushes.

The sister of the deceased, Flora Rosa, with his eldest daughter, were gathering beans near by at the time the altercation occurred. They could not see the deceased very well on account of the *gandule* bushes being quite large and between the brother and sister. The conversation between the slain and the slayer was in an ordinary tone and did not last very long.

Juana Rivera, the mother-in-law of the deceased, was in the cabin waiting on her daughter, who was in bed, about to give birth to a child. On hearing the shot she came out and saw José Rosa falling and Flora and the children coming toward him.

Besides the slayer and the slain there were present at the killing Bartolo Arroyo, and, perhaps a little way off, José González, the sister of the deceased, Flora Rosa, and his two little daughters, besides his mother-in-law in the house near by. At some distance also was a man working in the canefield, named Césaro Fernández.

The accused is an American and he had the reputation of being a man of good conduct, not having taken part in any fight or quarrel and attentive to his work, and is considered to be a gentleman. The deceased was a Porto Rican, and a tenant of the accused.

### DISPUTED QUESTIONS OF FACT.

First. *Who was the aggressor?*

(*a*) Juana Rivera says that "the accused arrived and stepped forward and slapped Rosa, who put his hand around his (the American's) waist and then the accused shot him. José Rosa went forward to the American, threatening him, and then the American shot him. José Rosa and the accused had only a few words and there was not any struggle between them. On hearing the voice of the American she came out into the yard and they spoke two words, which were not heard by her, and when the American spoke Rosa straightened up and the American gave him a slap; then Rosa put his arms around the waist of the American, and he shot him."

(*b*) Bartolo Arroyo says that "on reaching home he heard Rosa speaking, and looking out of the window saw Sutton, who had arrived and said something to Rosa in a low tone of voice, and when he met him the American gave him a punch and he jumped back; then the American put his hand inside of his shirt when Rosa jumped to catch him; then the shot rang out, and Rosa fell. Rosa was the one who jumped to grab the American. José Rosa, who was on all-fours, grabbed the accused in order to prevent him from drawing the revolver. The American had one hand outside and one inside of the shirt, where he had the revolver. Both of them were on their all-fours, and Rosa with his two hands had the American caught by the arms."

(*c*) José González says that "he saw them when the American met Rosa, grabbing each other, going in opposite directions; while in the struggle the American pulled out the revolver and shot Rosa, who fell dead; that the accused had the pistol inside the waistband of his pants and took it out and shot."

(*d*) Césaro Fernández says "he heard a noise and saw some colored people, three of them, fighting the accused. At first he did not know who it was because he was hidden in the midst of them; just then they pushed him and one of his legs was shown, and he knew the accused by his pants. Then he heard a shot and the man who had the accused

grabbed let him loose and walked, falling to the ground. José Rosa was the one who had the accused grabbed, and the rest were grouped around, Bartolo being one of them, but he was not in the struggle with the accused, but they were all together.''

(*e*) George Sutton, the defendant, in his own behalf, testified that the day of the event he was going around the estate and on passing near where José Rosa lived saw him working on the ground and saw two other fellows talking, of whom he asked, ''Who is planting?'' A somewhat extended conversation ensued. Rosa at the same time stepped forward, knocking him (the defendant) with his hand. The witness defended himself and felt a punch on the right hand and saw some blood. He continued fighting with Rosa in order to catch his hand, and when this was done another fellow held him by the back and he felt a knock made by a fist on his head. The witness put his hand inside of his shirt in order to get out his revolver, and the third party grabbed him by the waist, catching his right arm in such a way that he could not get out his revolver. He continued struggling while grabbed by José Rosa, who was giving him knocks; and in this way the four of them continued clinched to each other. The witness felt a cut on his feet, and on lifting the barrel of the pistol shot it off underneath the shirt, because, as stated, his arm was held by the other fellow, by the name of José González, and a shot was fired. Right then they all let him go free. José Rosa walked about 15 or 20 feet towards his house and fell, with his mouth towards the ground.

Second. *Was the deceased armed?*

(*a*) Flora Rosa says that the deceased was pulling up the *yuca* with his hands, because the ground was sandy, and he did not have a knife.

(*b*) Juana Rivera says that José Rosa was planting some *yautías;* then he went to pull up some *yucas.* José Rosa was pulling up the *yucas* with his hands, and to work he had used a spade, which he left near the *yautías.*

(c) Bartolo Arroyo says that José Rosa was pulling up some *yucas* with his hands; that he had no weapons, and that around him there were no knives nor anything else.

(d) José González says he did not notice whether José had any knife or not.

(e) George Sutton says that he saw in the hands of José Rosa a piece of *machete;* that he saw some blood; he felt a cut on his feet, and that he was wounded; that the wounds and scratches he had on his body were caused by the struggle with Rosa, and were not made by the wire fence nor by anybody else but by Rosa.

Third. *Was the accused scratched by the barbed-wire fence?*

(a) The principal witness in regard to the fence is María Rodríguez, who testified as follows: That on the 11th day of March last she lived at "Cachete," and there were several neighbors, among them José Rosa, who lived further out; and on that day she saw the accused going around the *corral* of the house with a revolver in his hand, by the wire fence, bending down his head; that there are three wires with barbs; two of them are down on the ground and another in good shape and high up; that the accused on passing had his clothes torn on the back, without seeing if it was by the back, leaving the torn piece of cloth at the wire fence.

(b) On questions propounded by the attorney she says that she made it possible so that the *fiscal* (the prosecuting officer) would know it, because the detectives asked the witness if she had seen something, and she answered that she had seen Mr. Sutton passing through the wire fence with the revolver in his hand; that when she was asked by the detectives about it Mr. Sutton was not there; and she cannot tell the date the witness saw the accused pass, but they say that it was on May 11, and she sustains that on that same day, the 11th of May, was when she saw Mr. Sutton passing by the *corral* of her house.

(c) Dr. Manuel Fosas testified that on that day, referred

to by the *fiscal,* he saw the accused about 5 o'clock in the afternoon, observing several wounds which he had; they were superficial, such as scratches, made by an instrument somewhat dull; some wounds were filled with dirt, and he believes that he got said dirt when he fell to the ground after the accused had been wounded, or because the weapon with which he was wounded was full of dirt. In two or three wounds the witness observed that there was dirt inside of them; they could have been made with an instrument very dull, as a dull knife; the wounds correspond to the clothes that the accused had on at the time.

(The attorney presented as proofs said clothes in evidence over the opposition of the *fiscal,* and the court admits them as such.)

The witness says that those clothes were the ones the accused had on the day of the event, and on the shirt there is a hole, looking as if it was a bullet hole, and a burn which corresponds to the hole; the accused had five wounds, some on the side and on the limbs and others on the back, corresponding with those cuts in the clothes.

On being asked by the *fiscal,* he said that such wounds on the back could have been made by wire-fence barbs, but not the ones on the legs; that the cuts on the shirt could have been made by the wire fence, and also could have been made during a struggle with another party.

On being asked again by the accused, through his attorney, he says that the wounds on the back could have been made by the wire fence or by a dull knife.

Being asked by the judge, he says that he recognized the accused in town about 5 o'clock in the afternoon, the estate being 10 minutes' walk from there; the wounds were superficial and irregular; they had lacerations and could have been made with a knife or weapon somewhat dull, which also cut the clothes, but with force. Said wounds could have been made with a knife not sharpened, but to cut up the cloth of the garment there would have to be a man quite strong; that

the cut which there is on the right leg of the trousers could be made either with a sharp knife, with a cutlass, short sword, a saber, or a table knife, and the weapon would have had to have been thrust in different directions.

(*d*) Césaro Fernández says that when the accused ran away from the scene of the combat it was "with the shirt torn up and the clothes hanging down."

(*e*) George Sutton says that he was wounded in the struggle with Rosa; that the wounds and scratches he had on his body were caused by the struggle with José Rosa; that after the event he did not go under any wire fence, and on that account he is assured that the scratches were not made by the wire fence or by any other body, but were made by Rosa.

The trial court, in his opinion, sets forth fully his views of the case, and it may be regarded as equivalent to the findings of fact and conclusions of law, which are now required by statute to be filed by the district judge in every case tried without a jury. In order fully to understand the position taken by the judge below, in weighing the evidence as well as in settling for himself the law of the case, it is best to quote his opinion entire. It follows in these words:

"Before rendering my verdict in this case, I want to state several facts, and especially one among them, to whose statement I am led not only by the oral testimony but also and chiefly by ocular inspection.

"From all the evidence introduced in this case I arrive at the firm conclusion, and without any reasonable doubt whatever, that on the 11th of March of this year and in the neighborhood of the town of Bayamón of this judicial district, George Sutton, who was in charge of a farm, a portion of which was leased to José Rosa, met the latter at a moment when he was digging out *yuca* roots, in which task he was using no sharp tool, had not it on him, nor had he any near him. That in such circumstances and on account of the rental a quarrel arose between George Sutton and José Rosa, in which the former attacked the latter and a hand-to-hand fight ensued. And during said fight the accused, George Sutton, using a revolver which he had

under his shirt, and without taking it out, but raising the barrel a little, fired a shot which, wounding José Rosa through the heart, caused his death almost instantaneously; after which the accused fled, having to cross, as he did cross on his way, through a barbed-wire fence, the barbs of which caused some scratches on his body and tore his garments accordingly.

"And on this point what we wish to state emphatically is, that the impression left on us by the examination of the tearing of those garments which have been introduced as evidence by the accused is that said tearing was caused by the barbs of the wire, and by nothing else.

"The doctor who examined Sutton a few hours after the event which took place between Sutton and Rosa admits that the scratches or wounds with dirty edges made on the back, shoulders, and legs of the accused could have been caused by barbs of barbed wire or by an instrument with a blunt edge.

"Between such conjectures the court decidedly is of the opinion that the tearing of the garments corresponding to the wounds or scratches found on the accused were not caused by a knife or similar weapon, blunt or not very sharp, but by barbs of barbed wire.

"We have very carefully examined the tearing of those garments, and by the shape of the several pieces torn off we are of the opinion, and firmly believe, that they were not produced in any other way than that already stated, because otherwise those cuts would not have had the irregularities shown, but would have presented a line more or less regular in its edges according to the weapon with which they were inflicted.

"And besides, the accused, who is the only one to make mention of a weapon in the hands of the deceased, does neither state positively that fact nor has he been able to give an idea of the kind of weapon that the latter had.

"And this conviction existed in my mind previous to the testimony of the witness, María Rodríguez, corroborating said statement, when she asserts that she saw the accused while he was passing through the barbed-wire fence and had his garments torn to such an extent that some pieces torn off from his shirt remained on the barbs of the wire.

"From the foregoing we are of the opinion that the accused is guilty of the crime of voluntary manslaughter with which he has been charged, and that when he committed the deed imputed to him he did not do it in self-defense."

On comparing the opinion of the trial judge with the statement of the case it will be found that many of his *findings of fact* have very slight foundations in the testimony, and that his conclusions of law are not fairly and properly based on the evidence certified to by him in the statement.

The trial judge misapprehended the facts in several important particulars. The finding is made that the surgeon had testified that "the scratches, or wounds with dirty edges, made on the back, shoulders, and *legs* of the accused could have been caused by barbs of barbed wire or by an instrument with a blunt edge." This is not in accordance with facts as certified to by the trial judge himself in the statement of the case. The statement recited: "On being asked by the *fiscal* (the prosecuting attorney) he (the doctor) says that such wounds *on the back* could have been made by wire-fence barbs, *but not the ones on the legs;* that the cuts on the shirt could have been made by the wire fence, and also could have been made during a struggle with another party." Then the finding of the trial judge that "The wounds or scratches found on the accused were not caused by a knife or similar weapon, blunt or not very sharp, but by barbs of barbed wire," is not justified by the testimony of the doctor, on which it is partly based.

Another error of fact into which the trial judge plainly fell is when he states: "And besides, the accused, who is the only one to make mention of a weapon in the hands of the deceased, does neither state positively that fact, nor has he been able to give an idea of the kind of weapon that the latter had.

On the contrary, Sutton, in his testimony as set out in the statement, positively says "he saw in the hand of Rosa a piece of a *machete* (a cutlass)  *  *  *. The wounds and scratches which the witness (Sutton) had on his body were caused by the struggle with José Rosa.  *  *  * After the event the witness did not go under any wire fence, and on that account he

can assure any one that the scratches were not made by the wire fence, but were made by Rosa."

The fact that Sutton fired the fatal shot from his pistol while the weapon was within his shirt is treated by the trial judge as showing that the accused took an unfair advantage of the deceased, entirely ignoring the testimony of Juana Rivera that Rosa "had his hands around the American's waist"; and of Bartolo Arroyo, that "both of them were on their all-fours and Rosa with his two hands had the American caught by the arms"; and of José González that "while in the struggle the American pulled out his revolver and shot José"; and of Dr. Fosas that "on the shirt there is a hole, as if it was a bullet hole, and a burn which corresponds to the hole"; and of Césaro Fernández that "José Rosa was the one that had the accused grabbed and the rest were grouped together"; and of Sutton himself that he "felt a cut on his feet and on lifting the barrel of his pistol shot it off underneath his shirt because, as stated, his arm was held by José González."

The trial judge further, in commenting on the testimony of Dr. Fosas, says that he *admits* that the wounds or scratches found on the body of the accused could have been caused by the barbs of a wire fence, thus treating the witness as if he were representing the accused and not as an expert called by the state to give a professional opinion on the facts of the case. In another paragraph the trial judge speaks of the opinions given by the medical witness as *"conjectures,"* showing that the expert testimony was entirely disregarded, though there is nothing in the record to warrant its rejection, but on the contrary it appears to be entirely worthy of credit. Certainly in these particulars there was a serious misapprehension of the circumstances of the case.

The trial judge attempts to say from an examination of the garments and from the shape of the rents in them that the wounds on defendant's body were caused by the barbs on the wire fence, though the expert testimony says that some of

them could not have been so caused and that others, while they might have been produced by the fence wire, might also have been made by a blunt knife or a similar weapon. Thus the judge sets himself up as an expert in opposition to the expert witness introduced by the prosecution. This was a gross irregularity which worked a great detriment to the cause of the defendant.

These misapprehensions on the part of the trial court are on vital points and clearly show a misapprehension of the evidence and consequent miscarriage of justice.

Let us now compare the facts as found by. the trial judge in the foregoing opinion with those embodied in and certified to by the same judge in the statement of the case as heretofore set out. A careful examination will show a manifest failure on the part of the trial court properly to weigh and consider the evidence adduced. The testimony of the defendant is entirely rejected, even where corroborated by the other witnesses and by admitted facts and the surrounding circumstances of the case. No witness states that any search was made on the ground where the affray occurred for the broken *machete* which the defendant says the deceased had in his hand and with which the accused was wounded.

The evidence of the two women is very contradictory and inconsistent and should not have received much consideration, being based largely on hearsay and evidently warped by their relationship to the defunct. The testimony of Bartolo Arroyo also shows that he was a close friend, a *compadre,* of the deceased, and is evidently not a full and fair statement of all he knew about the matter. He clearly tried to conceal the part he himself took in the combat and to avoid saying anything in favor of the accused.

The testimony of José González is not subject to any adverse criticism, but as reported in the record is very meagre.

The only witness who appears to have coolly observed the encounter and to have been absolutely impartial in his feelings and statements was Césaro Fernández, and he corro-

borates the defendant in many important particulars. If he told the truth the killing of Rosa occurred in self-defense on the part of Sutton, and was almost, if not entirely, unavoidable. Why should not such testimony be given due weight by the trial court in the decision on the guilt or innocence of the accused?

It is inconceivable that Sutton, or any sane man, would have gone out on the estate of which he had charge to kill a tenant whom he had never met before that day without any provocation whatever; without any struggle, when no danger was impending to himself, and when only a few words had passed between them, and those in a low tone of voice.

If necessary to the decision of the case it might readily have been determined by this court that the trial judge, in his opinion and judgment, committed manifest errors and therefore that there had been a miscarriage of justice in the decision of this case. And had the court arrived at this conclusion surely the judgment of conviction should not have been allowed to stand.

I do not for an instant harbor the thought that the eminent judge who tried this case below was swayed by partiality, passion, or prejudice, but several errors are certainly made manifest by a careful inspection of this record, and in consequence thereof the defendant has been deprived of a fair trial.

The trial judge finds correctly from the evidence that there was a combat between the slayer and the slain, or a struggle, if that is a more accurate term. Then why should he exclude the defendant from the benefit of his plea of self-defense. Even if the deceased may have been unarmed, he was a tall, powerful man, capable of inflicting serious bodily harm on the defendant, and this fact was well known to both contestants.

Of course, as we have frequently held, where the evidence is contradictory we must accord to the trial judge who tries the case without a jury credit for having given the proper

weight and credence to the testimony of the several witnesses, unless, on a review of the whole case, we are satisfied that the judge was swayed by partiality, passion, or prejudice, or that manifest error has been committed and consequent injustice has been done.

But such a presumption, as that accorded the findings of the trial judge on the facts, does not attend the action of the judge in applying the law to the facts. For instance, if we find that the judge has found it as a fact that the deceased was unarmed, although the testimony is conflicting on that point and from this mere fact inferred, as a matter of law, that there could have been no self-defense, and on that account has deprived the defendant of the benefit of the plea of self-defense, this is an error of law which would require a reversal.

This is just what the trial judge did, and there was not only an altercation but a struggle, and the defendant's arms were pinioned to his sides by his adversaries, so that he could not effectually defend himself; and in such a situation he caught his pistol, beneath his shirt, being unable to draw it out, and in this condition of affairs the fatal shot was fired. The accused, if acting in self-defense, as it clearly appears to me that he was, was amply justifiable and should not have been convicted.

It must further be borne in mind that in a trial before the judge alone, as well as before a jury, the accused is entitled to the benefit of any reasonable doubt of his guilt, or of the existence of any material fact necessary to establish his guilt. Can any one calmly review all the evidence in this case, giving credence to the uncontradicted facts and carefully weighing and comparing the contradictory statements of witnesses, and conscientiously say that Sutton was not acting in self-defense, and was therefore guilty of the crime charged against him? For my part, I certainly cannot. Surely under such circumstances, in my opinion, the judgment of conviction ought not to be allowed to remain unreversed.

There is a manifest error in the trial of this case in the

district court in improperly weighing the evidence, rejecting some of it and giving undue importance to other parts of it, and in making unwarranted inferences from disputed facts as well as in misinterpreting and misapplying the law, especially that of self-defense, to the detriment of defendant's rights as a citizen who, previous to the fatal affray, was conducting himself in an orderly manner on his own land. So the judgment of the court below should have been reversed and a new trial granted to the accused.